### INTERNATIONAL MOLDERS' AND ALLIED WORKERS' LOCAL UNION NO. 164, et al., Plaintiffs,

v.

### Alan NELSON, et al., Defendants.

### No. C–82–1896 RPA.

United States District Court, N.D. California.

Sept. 4, 1986.

---

**16.** Emphasis in the original.

Patrick Ramirez S. Bupara, Judith Whetstine, Asst. U.S. Attys., San Francisco, Cal., David Kline, Office of Immigration Litigation, Washington, D.C., for defendants.

Morris J. Baller, Susan E. Brown, Mexican American Legal Defense and Educational Fund, San Francisco, Cal., Bill Ong Hing, Golden Gate University, Immigration Law Clinic, Berkeley, Cal., Mort Cohn, Golden Gate University, Constitutional Law Clinic, San Francisco, Ca., William R. Tamayo, Asian Law Caucus, Inc., Oakland, Cal., Alan L. Schlosser, American Civil Liberties Union, Foundation of Northern California, San Francisco, Cal., Kip Steinberg, National Lawyers Guild, San Francisco, Cal., David Grabill, California Rural Legal Assistance, Santa Rosa, Cal., for plaintiffs.

## SECOND AMENDED ORDER GRANTING PRELIMINARY INJUNCTION AND DENYING STAY

AGUILAR, District Judge.

This case arises out of approximately fifty workplace raids (also known as "factory surveys" and "area control operations") conducted by the Immigration and Naturalization Service (INS) and Border Patrol during the week of April 26, 1982. These raids took place in Northern California as part of a nationwide campaign known as "Project Jobs" or "Operation Jobs." Plaintiffs also describe numerous other workplace raids conducted after Operation Jobs.[1]

The named plaintiffs are several businesses that have been raided by the INS, individual workers who allegedly have been detained or seized in these same raids, and a labor union that represents some of these workers. The Court already has certified a plaintiff class consisting of

> all persons of Hispanic or other Latin American ancestry, residing or working within the jurisdiction of the San Francisco District Office of the United States Immigration and Naturalization Service (INS) and/or the Livermore Border Patrol Sector, who have in the past, are now, or may in the future be subjected to the policies, practices, and conduct of INS and/or the Border Patrol during the course of INS area control operations

---

1. "Open fields" raids are not the subject of this litigation.

directed at places of employment other than open fields.

*See International Molders' & Allied Workers' Local Union v. Nelson*, 102 F.R.D. 457 (N.D.Cal.1983). The defendants are various commissioners, directors, and agents of the INS and Border Patrol.

Plaintiffs contend that defendants' raids, in which INS and Border Patrol agents arrive at a workplace, position themselves at exits, and enter in force to question workers about their citizenship status, violate plaintiffs' constitutional rights. Plaintiffs claim that these raids are often conducted without a warrant, with an improper warrant, with the coerced consent" of the employer, or after the agents themselves deliberately provoke exigent circumstances to justify their entry. Once inside, agents indiscriminately question employees of hispanic appearance, whether or not the agents have any reasonable, articulable suspicion of alienage. Those workers who cannot immediately prove their lawful status to the satisfaction of one or more agents are detained or arrested. Other workers are seized and abused even before agents have asked them any questions about their citizenship status. United States citizens and lawful aliens are unlawfully detained, interrogated, harrassed, and assaulted solely because of their appearance or language. Finally, it is primarily Hispanic workers who are so treated; Asian and Caucasion aliens do not suffer the same indignities. Plaintiffs have offered deposition and affidavit testimony describing nearly thirty raids at the premises of twenty-four employers. Defendants have offered rebuttal testimony.

The questions raised by the present motion for preliminary injunction concern 1) the manner in which defendants gain entry into the non-public areas of private business premises, and 2) once on the premises, the manner in which defendants conduct the raids. More specifically, the five cen-

tral issues[2] are whether the defendants routinely:

1. use general, open-ended "warrants of inspection" that violate the fourth amendment;

2. coerce employer "consent" in order to circumvent the warrant requirement;

3. deliberately create, in bad faith, "exigent circumstances" in order to circumvent the warrant requirement;

4. detain and seize workers without reasonable, articulable suspicion of illegal alienage in violation of the fourth amendment;

5. single out Hispanic workers for interrogation and detention, violating these workers' right to equal protection.

 To obtain a preliminary injunction, plaintiffs must *either* establish a likelihood of success on the merits, *or* present serious questions and show that the balance of hardships tips sharply in their favor. In either formulation of this "sliding scale" Ninth Circuit test, plaintiffs must demonstrate a "significant threat" of irreparable harm absent the issuance of the injunction. *Oakland Tribune, Inc. v. Chronicle Publishing Co.*, 762 F.2d 1374, 1376 (9th Cir.1985). It bears repeating that on a motion for preliminary injunction this Court is not required to make any binding findings of fact, but need only find probabilities that the necessary facts can be proved. *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1423 (9th Cir.1984).

The Court has painstakingly reviewed approximately two thousand pages of evidentiary material comprising 49 deposition transcripts and 64 affidavits of 74 different witnesses. The Court has endeavored to identify the uncontradicted, corroborated, or particularly credible testimony, and that testimony which is vigorously contested, equivocal, or less credible. The Court concludes that, although certain evidence relating to several of the alleged incidents is

2. Plaintiffs allege additional fifth and sixth amendment violations that are not before the Court on the present motion.

inconclusive, there is sufficient evidence of several INS policies and practices that result in recurrent constitutional violations to merit a preliminary injunction.

## STANDING

As a preliminary matter, defendants argue that the plaintiff class has no standing to object to the entry of third parties onto business premises where the class members are employed; only the owner or manager of the business may so object. Defendants further suggest that because the plaintiff businesses are not class members, and because they cannot vicariously assert the constitutional rights of others, they are not entitled to relief on this motion.

■ It is true that employers and employees cannot vicariously assert each others' fourth amendment rights. *See, e.g., Alderman v. United States,* 394 U.S. 165, 171–72, 89 S.Ct. 961, 965–66, 22 L.Ed.2d 176 (1969); *United States v. Nadler,* 698 F.2d 995, 998 (9th Cir.1983). Also, it is uncertain to what degree workers can have any subjective expectation of privacy in the workplace. *INS v. Delgado,* 466 U.S. 210, 104 S.Ct. 1758, 1767, 80 L.Ed.2d 247 (1984) (Powell, J., conc.).

■ Yet plaintiffs do not suggest that the business plaintiffs and the class plaintiffs are vicariously asserting each other's rights. Rather, the corporate entities have their own rights to assert based on the alleged warrantless entries, improper warrants, coerced consent, or fabricated exigent circumstances involving their properties. *E.g., Blackie's House of Beef, Inc. v. Castillo,* 659 F.2d 1211, 1216 n. 5 (D.C.Cir. 1981). Although the businesses are not class members, they are nonetheless parties and may seek injunctive relief on their own behalf. *Cf. Zepeda v. INS,* 753 F.2d 719 (9th Cir.1985).

■ The individual worker plaintiffs, as the objects of the searches, interrogations, detentions, and seizures, independently meet the traditional Article III standing requirements. They clearly have a "personal stake" in the litigation, owing to their alleged injuries caused by the purported illegal conduct of the defendants, which injuries are likely to be redressed if this Court rules in their favor. *See LaDuke v. Nelson,* 762 F.2d 1318, 1322–23 (9th Cir.1985). Even if the Court treats the workplace as a public area in which workers have no reasonable expectation of privacy, workers are still entitled to assert their fourth amendment rights against unreasonable searches, detentions, and seizures of their persons, and their fifth amendment rights to equal protection.

All plaintiffs have standing.

## INS ENTRIES INTO WORKPLACES

Defendants attempt to justify most of their workplace entries on at least one of three grounds: "warrants of inspection", authorizing entry into the non-public areas of particular premises; "consent" to enter the premises given by an owner or manager; and "exigent circumstances" that require warrantless, non-consenual entry in order to pursue and apprehend fleeing suspects.

### Warrants of Inspection

It appears that during Operation Jobs warrants were obtained for eight of the approximately fifty raids. Subsequent to Operations Jobs, warrants were used even less frequently. After this case was filed and the Ninth Circuit decided *ILGWU v. Sureck,* 681 F.2d 624 (9th Cir.1982), *rev'd sub. nom. INS v. Delgado,* 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984), defendants began to utilize warrants more frequently, and now use them for many, but not all, workplace raids.

The warrants, labeled "warrants of inspection," typically name one or more individuals thought to be illegal aliens who are working at a specified location, but then go on to allow the INS to seek and seize unspecified and unlimited "others" on the premises who may also be illegal aliens. Although a warrant may list from four to thirteen suspected illegal aliens, as many as seventy people may be arrested, and few or none of these will be the people named

in the warrant. In the eight warrant-based raids described in this motion, 192 individuals were arrested. Of these, 179 were "others" not identified in the warrants. Of the 51 persons named in the various warrants, only 13 were found on the premises.

The typical INS warrant of inspection reads in pertinent part:

I am satisfied that there is reasonable cause to believe that [several named persons] *and others* are illegally in the United States and are subject to deportation from the United States, and are located on the above-described premises during normal working hours.

WHEREFORE, YOU ARE HEREBY COMMANDED:

To search within a period of ten (10) days the place named above for the persons specified, *and others suspected of being illegal aliens* ... and if such persons are found there to seize them....

(emphasis added). INS officers present the magistrate with supporting affidavits as to the named suspects, but the use of "others" is rote language; these "others" usually are not identified or even known with any certainty to exist. The warrants say nothing about how the searches may be carried out, other than permissible hours of entry, or how INS agents are to determine which persons are to be interrogated or seized as suspected "others". The warrants neither direct nor limit agents to the portions of the premises where the named suspects are likely to be found.

Defendants admit that they use the warrants to gain entry into workplaces for generalized searches for illegal aliens. Indeed, the evidence indicates that in many raids the INS agents make no particular effort to apprehend the suspects named in the warrants, but rather base their decisions as to which workers to question, detain, or seize solely on information or observation gained *after* they have entered.

Plaintiffs argue that these are "general warrants" that fail to describe with the requisite particularity the persons to be seized. They authorize searches and arrests without probable cause having been found by a neutral magistrate for each individual, resulting in precisely the kind of discretionary, open-ended "fishing expeditions" that the fourth amendment was designed to prevent. Plaintiffs suggest that defendants use these warrants as a pretext to avoid the stricter requirements of traditional warrants.

*Blackie's House of Beef*

Few courts have addressed INS' use of these "warrants of inspection." The Ninth Circuit did not reach the issue of the validity of similar warrants in *International Ladies' Garment Workers' v. Sureck*, 681 F.2d 624, 629 & n. 8 (9th Cir.1982), so the Supreme Court had no occasion to address the problem when it reversed *Sureck* in *INS v. Delgado*, 466 U.S. 210, 104 S.Ct. 1758, 1760, 80 L.Ed.2d 247 (1984). Defendants rely on the only circuit case on point, *Blackie's House of Beef v. Castillo*, 659 F.2d 1211 (D.C.Cir.1981), *cert. den.* 455 U.S. 940, 102 S.Ct. 1432, 71 L.Ed.2d 651 (1982).

In *Blackie's*, the District of Columbia Circuit found a similar INS warrant valid. Although the court noted that "the applicability of the Warrant Clause of the fourth amendment to INS enforcement activities can no longer be doubted," *id.* at 1217 (citing *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973)), it held that the traditional probable cause standard for criminal searches and seizures did not apply. The court reasoned that 1) INS investigations are civil in nature, 2) Congress contemplated a vigorous INS enforcement program, and 3) without broad search powers the INS would find it difficult to apprehend large numbers of aliens. *Id.* at 1218–25. The *Blackie's* court analogized the INS raids to administrative inspections, requiring only an assessment of the "reasonableness *vel non* " of a particular warrant. *Id.* at 1223. The court found that the warrant at issue was sufficiently narrow and its supporting affidavits sufficiently particular to meet a reasonableness test.

One other court has adopted the *Blackie's* analysis to uphold a similar warrant.

In *Kotler Industries v. INS*, 586 F.Supp. 72 (N.D.Ill.1984), the court noted:

> Assuming *arguendo* that INS was authorized to search for the listed suspects only, INS agents still would have had to completely search the factories as well as to question every employee who might be listed as a suspected illegal alien. And the discovery of unnamed aliens during the course of the search would in no way be tainted. Factory owners' rights are not violated by the failure of INS to limit its searches to the list of suspects appended to the warrants.

*Id.* at 76.

■ Plaintiffs correctly point out that an INS raid logically cannot be analogized to an administrative inspection, the sole purpose of which is to inspect *premises* rather than to search for or arrest *persons*.[3] Administrative inspections are conducted pursuant to legislative schemes that authorize and strictly regulate such inspections, and are part of systematic programs to monitor industries or working conditions traditionally subject to close government scrutiny (e.g. OSHA, food and drugs, alcohol, firearms). *See Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978). Congress has not legislated any such administrative enforcement scheme for aliens, and INS workplace raids are not strictly regulated.

At least two courts agree. In *Illinois Migrant Council v. Pilliod*, 531 F.Supp. 1011 (N.D.Ill.1982), the court opined that, assuming *arguendo* that the *Blackie's* panel correctly decided that INS may utilize an administrative warrant to enter and search a commercial building, "such a warrant does not authorize the search or seizure of persons found on the premises." The court reasoned that the Supreme Court has never held that an individual may be searched or seized on anything less than reasonable suspicion that he is engaged in criminal activity. *Id.* at 1020–21. In *United States v. Karathanos*, 399 F.Supp. 185, 188 (E.D. N.Y.1975), the court rejected "any analogy" between administrative searches per *Camera* and INS power under 8 U.S.C. § 1357.[4] Cf. *Mendoza v. INS*, 559 F.Supp. 842, 847 (W.D.Tex.1982) (warrantless dragnet searches and seizures in commercial establishments violated the fourth amendment).

It cannot be denied that the *Blackie's* analysis is a radical departure from established fourth amendment doctrine. The Supreme Court recently has affirmed that an individual may not be searched or seized on anything less than reasonable suspicion that he is engaged in criminal activity. *E.g., United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). No court has held that a criminal warrant can be based on anything less than probable cause, and at least since the Supreme Court decided *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), a warrant authorizing the search of premises and specified individuals is not an adequate basis to search *all* the individuals on those premises. *Id.* at 90–92, 100 S.Ct. at 341–343; *see Lo-Ji Sales, Inc. v. New York*, 442 U.S.

---

3. Plaintiffs further contend that the facts of *Blackie's* are distinguishable from those of the case at bench. The *Blackie's* warrant was issued on a compelling showing that there would be numerous illegal aliens on the premises. 659 F.2d at 1226–27 & n. 17. The unnamed "others" of the *Blackie's* warrant for the most part were not hypothetical individuals who might be discovered during the course of the raid; they had been previously observed and identified through informers and INS stakeouts as likely illegal aliens. This Court does not reach the factual distinctions posed by *Blackie's*.

4. 8 U.S.C. § 1357(a)(1) and (2) provide that an INS agent

> Shall have power *without warrant*—(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States; (2) to arrest any alien ... in the United States, if [the INS agent] has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest....

*Id.* (emphasis added).

319, 326–27, 99 S.Ct. 2319, 2324–25, 60 L.Ed.2d 920 ("Fourth Amendment does not countenance open-ended warrants, to be completed while a search is being conducted and items seized"); *VonderAHE v. Howland,* 508 F.2d 364, 368–69 (9th Cir. 1974) (warrant is defective if it is broader than can be justified by the probable cause upon which it is based).

■■■ The *Blackie's* court in part based its rejection of traditional probable cause analysis on the supposed non-criminal, "administrative" character of workplace raids. The Ninth Circuit, however, has made it abundantly clear that INS enforcement activities are to be scrutinized under traditional fourth amendment doctrine. In *Zepeda v. INS,* 753 F.2d 719 (9th Cir.1985), the court indicated that the power of INS agents to question and seize suspected aliens under 8 U.S.C. § 1357[5] is co-extensive with such power under the fourth amendment. *Id.* at 726 (citing *Babula v. INS,* 665 F.2d 293, 295 (3d Cir.1981)). In *LaDuke v. Nelson,* 762 F.2d 1318 (9th Cir. 1985), the court reaffirmed that in the "nonborder context the Fourth Amendment requires at least articulable suspicion of both alienage and unlawful presence for a detentive stop." *Id.* at 1331; *see Benitez-Mendez v. INS,* 760 F.2d 907, 908–09 (9th Cir.1985). Nondetentive interrogations are permissible on reasonable belief of alienage. *LaDuke, supra,* 762 F.2d at 1331. A warrantless arrest, on the other hand, requires probable cause for belief of illegal alienage. *Tejeda-Mata v. INS,* 626 F.2d 721, 724–25 (9th Cir.1980). In sum, INS agents may question a worker on suspicion of mere alienage, may detain him on articulable suspicion of illegal alienage, and may make an arrest if there is probable cause to believe that the person is an illegal alien. These cases give no indication that the "warrants of inspection" challenged here merit anything less than the usual probable cause inquiry. Indeed, it would be anomolous to adhere to a probable cause analysis for a warrantless INS arrest, yet discard that analysis when a warrant is at issue.

The *Blackie's* court also relied on Congress' contemplation of a vigorous INS enforcement program. Yet, as the Supreme Court has often repeated, "no Act of Congress can authorize a violation of the Constitution." *Almeida-Sanchez v. United States,* 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973). As for the INS' supposed difficulty in apprehending large numbers of illegal aliens, "the INS cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. INS,* 753 F.2d 719, 727 (9th Cir. 1985).

In light of this history, the defendants bear the laboring oar to demonstrate why the general, open-ended warrants here are not *per se* violative of the fourth amendment.

*Alternate Theories*

■■■ Defendants argue that courts uphold criminal warrants that provide for searches of "other" things. For example, in *United States v. Hillyard,* 677 F.2d 1336 (9th Cir.1982), the Ninth Circuit held that

[w]hen there is probable cause to believe that premises to be searched contains a class of generic items or goods, a portion of which may be stolen or contraband, a search may direct inspection of the entire class of all of the goods if there are objective, articulated standards for the executing officers to distinguish between property illegally possessed and that which is not.

*Id.* at 1340. *See United States v. Pollock,* 726 F.2d 1456, 1465–66 (9th Cir.1984). Defendants argue that the "generic contraband" in this case is illegal aliens, whom the INS may arrest upon probable cause even if they are unnamed in the warrant.

Defendants do not adequately explain how people can be equated with items of contraband; people enjoy fourth amendment rights, whereas objects do not. Accepting *arguendo* that illegal aliens should be treated like generic contraband that can be properly seized under a general war-

5. *See supra* note 4.

rant, the argument fails on these facts. Unlike the *Hillyard* case, in which the inspections were not intrusive and the warrant left nothing to the discretion of the agents, the agents in the present case were conducting disruptive dragnet operations with virtually unfettered discretion. Analogous facts are found in *Lo-Ji Sales, Inc. v. New York,* 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979), in which the Supreme Court held invalid a general warrant and the resulting search and seizure:

> Based on the conclusory statement of the police investigator that other similarly obscene materials would be found at the store, the warrant left it entirely to the discretion of the officials conducting the search to decide what items were likely obscene and to accomplish their seizure. The Fourth Amendment does not permit such action. Nor does the Fourth Amendment countenance open-ended warrants, to be completed while a search is being conducted and items seized or after the seizure has been carried out.

*Id.* at 325, 99 S.Ct. at 2324. Moreover, there is evidence that a number of the suspected illegal aliens who were detained or seized were in fact either United States Citizens or were otherwise lawfully present. It is patently unreasonable to subject citizens or lawful residents to routine violations of their fourth amendment rights, simply because they happen to work among illegal alien contraband. For these reasons, defendants' attempt to reduce suspected illegal aliens to the status of inanimate objects, even if accepted by this Court, is unavailing.

An alternative analysis implicit in the defendants' argument is based on the plain view doctrine: while searching for the specific illegal aliens named in the warrant, any other illegal alien whom defendants come across in plain view should also be subject to arrest. There are two problems with this proposition.

First, assuming once again that objects and people are interchangeable, defendants would have to meet the following Ninth Circuit standard for plain view seizures:

> In the course of a legal search, officers may make a warrantless seizure of objects *inadvertently* found in plain view, if it is *'immediately apparent* to the police that they have evidence before them....' [A]n officer may inspect an item found in plain view to determine whether it is evidence of a crime *if he has a 'reasonable suspicion'* to believe that the discovered item is evidence.

*United States v. Hillyard,* 677 F.2d 1336, 1341–42 (1982) (emphasis added). It is clear on this record that the INS agents do not "inadvertently" run across other illegal aliens during these workplace raids; they systematically search them out, and in fact often seem to disregard the names on their warrants altogether. Moreover, as discussed *infra* there is a serious question whether INS agents always have a reasonable, articulable suspicion of illegal alienage before detaining workers.

Second, defendants may be suggesting that they are entitled to search for and detain anyone present at the workplace as part of their execution of the warrant. The Supreme Court addressed an analogous situation in *Ybarra v. Illinois,* 444 U.S. 85, 90–96, 100 S.Ct. 338, 341–345. In *Ybarra,* the police had a warrant to search a tavern and arrest the bartender on drug charges. Upon entering the pub, the officers conducted a pat down search of each patron. The search of patron Ybarra uncovered some packets of heroin. The Supreme Court reiterated that "general" or "open ended" warrants are "constitutionally prohibited," and noted that "a warrant to search a place cannot normally be construed to authorize a search of each individual in that place." *Id.* at 92 n. 4, 100 S.Ct. at 342 n. 4. The Court held that, although the police were entitled to search the premises and the bartender for evidence of drugs, they had "no authority whatsoever to invade the constitutional protections possessed individually by the tavern's customers." *Id.* at 92, 100 S.Ct. at 342.

The *Ybarra* Court considered the argument that the important governmental in-

terest in controlling drug trafficking superceded constitutional protections:

> we are asked to construe the Fourth and Fourteenth Amendments to permit evidence searches of persons who, at the commencement of the search, are on "compact" premises subject to a search warrant, at least where the police have a "reasonable belief" that such persons "are connected with" drug trafficking and "may be concealing or carrying away the contraband.

*Id.* at 94, 100 S.Ct. at 344. The Court rejected this contention, and reaffirmed that the "long-prevailing" standard of probable cause is the vehicle by which courts must balance the needs of law enforcement and the rights of citizens. *Id.* at 95–96, 100 S.Ct. at 344–345.

Although the present case differs in several respects from *Ybarra*, defendants here similarly are using open-ended warrants as the basis for searching for and seizing persons not named in the warrant, and are asking this court to approve the practice due to the strong governmental interest in enforcing the immigration laws. To do so would eviscerate the fourth amendment and disregard compelling Supreme Court and Ninth Circuit authority.

In conclusion, The Court finds that defendants routinely use open-ended "warrants of inspection" as a means of gaining entry into workplaces for dragnet-style questioning and seizures of large numbers of workers at a particular site. The Court finds as a matter of law that to the extent the defendants rely on these warrants to search for and arrest unidentified and unknown "others", these warrants violate the fourth amendment and are invalid.[6]

*Proper Execution of Warrants*

Merely ruling that these warrants are invalid as to unspecified "others" does not resolve the question of how defendants should execute the warrants as to those individuals who *are* named or identified in

the warrant. As the court noted in *Kotler Industries v. INS, supra,* INS agents might well have to search the entire workplace and question numerous people before finding the suspects named in the warrant. It would seem inevitable that during this search and questioning process agents will find other suspected illegal aliens. Indeed, defendants argue that no previously unidentified suspect is ever arrested merely because of the warrant; probable cause is always obtained independently for each individual arrested. The question therefore arises whether, as a practical matter, defendants can be precluded from systematically searching out all potential suspects at a workplace.

In *INS v. Delgado,* 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984), the Supreme Court was faced with three workplace raids, two of which were conducted pursuant to warrants. These warrants were issued on a showing of probable cause that numerous illegal aliens were employed at the premises, but they did not identify by name any of the particular suspects. The Court did not address the validity of the warrants.

In *Delgado,* the Court found that the INS agents had moved systematically through the factory asking selected employees up to three questions relating to their citizenship. During the raid, employees continued with their work and were free to walk around within the factory. Although agents guarded the exits, no one was prevented from leaving after the same brief questioning, and some workers who left were not questioned at all. The Court thus found that the questioning of each worker was "nothing more than a brief encounter." *Id.,* 104 S.Ct. at 1764. While the questioning may have caused some disruption, in general the workers went about their work unhindered. *Id. passim.* Consequently, the Court concluded that workers "who simply went about their business

---

**6.** The Court does not here consider the possibility that defendants might be able to make a sufficient showing of probable cause to the magistrate or judge that most or all of the workers

at a particular workplace at a particular time will be illegal aliens. The record here does not present such circumstances.

were not detained in any way; nothing more occurred than that a question was put to them." *Id.* at 1765. These were "classic consensual encounters" that did not offend the fourth amendment. *Id.* The Court reiterated that unless "the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave," mere questioning does not evolve into a detention. *Id.* at 1763.

*Delgado* stands for the proposition that once agents are lawfully present at a workplace pursuant to a valid warrant or consent, they may conduct a sweep similar to that described in *Delgado* without running afoul of the fourth amendment. The question that the *Delgado* Court did not have to address, but that is squarely presented here, is whether an open-ended warrant naming "others" is a valid warrant entitling agents to make such a sweep.

This Court is not prepared to break with long-standing fourth amendment jurisprudence and condone a deliberate law enforcement policy of securing non-specific, open-ended warrants for the express purpose of conducting dragnet searches and seizures. Nor can this Court read the limited analysis in *Delgado* as an endorsement of such a policy and practice. At the same time, defendants must not be unduly hampered in executing warrants on those individuals identified or particularly described in the warrants. The reasonableness inquiry and the balancing of interests that underlie much fourth amendment analysis must be brought to bear to put limits on defendants' hitherto unfettered discretion, without eviscerating INS enforcement efforts.

■ An obvious solution was overlooked by the *Kotler* court. It is reasonable to require that the agents, upon their arrival at a workplace to serve a warrant identifying only a small number of individuals, first ask the owner or manager to immediately produce those individuals

named or identified in the warrant. The agents can still position themselves at exits and question or detain any workers attempting to flee. If the owner or manager is unwilling or unable to produce the suspects, it then becomes reasonable for the agents to enter and conduct a sweep. Even this sweep, however, must be directed at finding the named suspects as quickly as possible rather than questioning all workers. Any questioning that does transpire must resemble the brief, "consensual encounters" described in *Delgado.*

Such an approach to the execution of warrants will allow defendants to seize those suspects for whom they have probable cause to believe are in the country illegally. Yet it will also protect untold numbers of workers from violations of their fourth amendment rights. This is an appropriate and necessary accommodation of conflicting interests in this difficult area of immigration enforcement.

*Consent*

■ Defendants claim that several of their raids were based on consent. A warrantless search conducted pursuant to a valid consent is constitutionally permissible. In *Schneckloth v. Bustamente,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the Supreme Court ruled: "Whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Id.* at 227, 93 S.Ct. at 2047. Subtle coercion, implied threat, or covert force will render invalid a purported consent. *Id.* at 228, 93 S.Ct. at 2048. *See United States v. Sanchez,* 635 F.2d 47, 58–59 (2d Cir.1980). The prosecution has the burden to prove a valid consent. *Bustamente, supra,* 412 U.S. at 222, 93 S.Ct. at 2045.

The evidence shows that on at least one occasion INS agents obtained consent in advance for a search.[7] In April, 1983, INS

---

**7.** In another instance, defendants obtained a consent from the owner of Benicia Foundry after they had arrived at the premises. Plain-

tiffs contend that the resulting search exceeded the scope of that consent. *See U.S. v. Rubio,*

contacted the Levi-Strauss plant in San Jose. INS requested, obtained, and reviewed employment records, formulated a list of suspected undocumented workers based on those records, and then came at a pre-arranged time to the premises. Management brought the suspects to INS agents in company offices away from the production area, for identification interviews and detention. Work was not disrupted, the operation was orderly, and undocumented workers of a number of nationalities were arrested. INS agents and company officials cooperated fully. This would appear to be the optimal way for the INS to undertake workplace surveys.

 The record shows that it is more typical, however, for INS agents to arrive unannounced at premises that they have selected for a raid, and request permission to conduct the raid immediately. Although only the agent in charge makes the request, the other agents who are to participate in the raid are already in position, often guarding each exit. At some raids there are twenty or more agents who are visible to both management and workers. Thus, when consent is requested, it is usually clear that INS has both the intent and the ability to carry out the operation immediately. Plaintiffs' testimony describes the following alleged incidents.

At an April 1984 raid on Shamrock Technology, INS agents arrived at 5 p.m. and demanded consent from an office manager, the ranking company official present. Frightened, she telephoned her superior at home. The INS agent in charge allegedly told this second manager that if consent was not given for an immediate search, INS would return and "close the shop." Feeling that he had no choice, the manager gave the INS consent to search.

At another raid, numerous INS agents went to the premises of Steak Mate without a warrant, allegedly intending to seek consent for entry. In their answer to interrogatories the defendants asserted that the Steak Mate survey was based on a consent entry. Yet there is no evidence that either

manager on the premises gave consent, and one of the managers, Berry, testified that consent was neither requested nor given. Instead, the evidence suggests that INS vehicles and agents first entered at high speed onto the production areas of the premises, across the highway from the location of the office where the agents knew the managers were likely to be found. At that point the agents asserted a right to enter in order to chase suspects who were by that time fleeing.

In another instance, an INS agent entered a 7–11 store in San Jose on May 23, 1983, and asked the manager for consent to search non-public areas. When the manager, a naturalized citizen, refused and asked for a warrant, the agent allegedly told her that her citizenship would be revoked and her store closed down. The agent then accompanied her to a back room.

Having considered plaintiffs' evidence, and the defense testimony *contra,* the Court finds that plaintiffs have met their burden of raising a serious question as to the validity of the consents obtained by the INS for its workplace raids. It is evident that the agents at times make an abrupt and intimidating appearance, often in force, and do not inform the employers of their right not to consent. There is evidence of threats of retaliation, and it is clear that at least some employers believe they have little choice but to consent. The INS is well aware of alternative means of obtaining consent, and the means for obtaining a warrant. Finally, it is apparent that the agents expect workers to flee upon their arrival. Viewed in their totality, the circumstances of these raids support plaintiffs' contention that defendants often intend to either coerce consent, or rely on exigent circumstances before such consent is obtained, to avoid the inconvenience of obtaining a warrant.

*Exigent Circumstances*

Defendants contend that "exigent circumstances" justify many of their warrantless, unconsented-to entries. Specifically,

727 F.2d 786, 796–97 (9th Cir.1983). The court finds the evidence to be inconclusive.

defendants assert that when persons present on the premises run at the sight of INS agents, immediate entry is justified.

Exigent circumstances, such as the pursuit of a fleeing suspect, provide a legitimate exception to the rule requiring warrants for non-consensual entries. *E.g. United States v. Blake*, 632 F.2d 731, 733 (9th Cir.1980). Such entries and the circumstances on which they are based are normally permitted, however, only when unforeseeable events or emergencies require swift entry. *Id.* at 734. According to the Ninth Circuit,

> When police officers, acting on probable cause *and in good faith*, reasonably believe from the totality of the circumstances that (a) evidence of contraband will imminently be destroyed ... exigent circumstances justify a warrantless entry, search or seizure of the premises.

*United States v. Kunkler*, 679 F.2d 187, 191 (9th Cir.1982) (emphasis added). Good faith "means not acting with the intent improperly to circumvent the warrant requirement by purposefully precipitating a situation, 'through illegal conduct', in which the destruction of evidence or contraband is likely." *Id.* at 191 n. 3. *See United States v. Garcia*, 516 F.2d 318, 320 (9th Cir.1975). If fear that a suspect will escape is "created by the law enforcement officers, it will not support a warrantless search." *United States v. Calhoun*, 542 F.2d 1094, 1102–03 (9th Cir.1976), *cert. denied* 429 U.S. 1064, 97 S.Ct. 792, 50 L.Ed.2d 781 (1977).

In the instant case, the workplace entries based on exigent circumstances are typically preceded by the arrival of large groups of INS agents in several vehicles immediately outside the premises. It appears that there are often as many agents and vehicles present at these raids as at the warrant-based raids. The arrival of the agents usually becomes quickly known throughout the workplace. The evidence indicates that INS agents are well aware that when they and their vehicles appear at workplaces, at least some individuals are likely to run or hide. The evidence further suggests that

INS agents expect more turmoil, fear, and flight when their arrival is unexpected, sudden, and *en masse*. Plaintiffs' testimony describes the following alleged incidents.

In an April 1982 raid at Neve Roses, twelve INS agents in six vehicles drove at high speeds into a driveway, which they blocked. Although defendants claim they entered the premises from the adjacent roadway only after they happened to observe fleeing workers, almost all work at Neve is performed inside greenhouses and closed rooms in which workers are not visible from outside the premises. An August raid at the same location transpired in a virtually identical manner.

In a 1982 raid at Petaluma Mushroom, eleven INS agents in several vehicles entered at high speed, again after allegedly observing fleeing workers. Petaluma's manager states, however, that before the raid began there were no workers outside the closed rooms in which the mushrooms are cultivated and processed. INS raided again in August, using four agents and two cars. One of these agents had participated in the April raid.

The evidence suggests that INS agents expected to enter Neve Roses and Petaluma Mushroom, yet defendants have not adequately explained how they intended to gain entry. The record establishes that Neve and Petaluma had been raided many times over several years, that defendants had tips about the presence of illegal aliens on the property, and that warrants were not obtained. Plaintiffs have raised a serious question as to defendants' intent to enter those premises based on the "exigent circumstances" deliberately provoked by the manner of their arrival.

Defendants also use exigent circumstances as an alternative justification for their April 26, 1982 entry onto the Steak Mate premises. After the raid was in progress agents told a manager that they had intended to seek consent but no longer needed it since workers had begun to flee. Eight INS vehicles had entered the premises on private driveways, ostensibly in pur-

suit of running workers. The manager denies that any workers were running at the time INS entered. Again, the manner of the entry supports plaintiffs' contention that the agents intended to provoke the "exigent circumstances" that would justify their entry.

The court agrees with defendants that without speed and decisive tactics fleeing suspects will get away, and that most of those fleeing are illegal aliens hoping to escape arrest and deportation. This argument might carry the day if there were evidence that defendants first endeavored to secure warrants or consent before entering the premises. On this record, however, even if the Court could find that agents do not consciously intend to provoke flight, their awareness of the effect of their methods precludes a finding of good faith.

■ First, if defendants have the time and information to secure a warrant, they cannot rely on exigent circumstances. "[A]lthough the fact that adequate time to obtain a warrant exists will not in every case foreclose resort to exigent circumstances ... the availability of such time requires a stronger showing" of exigency. *United States v. Blake*, 632 F.2d 731, 734 (9th Cir.1980). In many of these raids INS claims it had tips or other information that led it to believe illegal aliens would be present. Yet there is no evidence that the agents attempted to secure warrants, or prior consent. Indeed, during the week of Operation Jobs, raid teams completed about ten raids per day, yet were dispatched each morning with only one or two warrants. Agents took along information about other suspicious employers in the same area as those for whom warrants had been obtained, intending to carry out additional raids as time permitted. The clear implication is that the agents intended to rely on exigent circumstances.

■ Second, even if the exigent circumstances were genuine and the agents were acting in good faith at the outset of each raid, defendants did not limit their searches and arrests to fleeing suspects; rather, they used the opportunity to question entire workforces, including those workers who did not flee or give any other indication that they were illegal aliens. "A warrantless search must be strictly circumscribed by the exigencies that justify its initiation...." *Mincey v. Arizona*, 437 U.S. 385, 393, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978).

Plaintiffs have met their burden of raising a serious question as to defendants' bad-faith provocation of "exigent circumstances" to circumvent the warrant requirement and accomplish dragnet-style searches and seizures.

*Entries With No Evident Justification*

It appears that in at least two instances defendants made entries without benefit of warrants, consent, or exigent circumstances.

In October 1982 at Mammoth Lakes Lodge, Border Patrol agents entered the employer-provided sleeping cabins of several workers. The entries were late at night. The agents had no warrant, and they did not attempt to get the consent of the owner, plaintiff Armstrong, who was in bed watching television. Nobody was fleeing; in fact, most of the residents were asleep. In July 1983, Border Patrol agents entered two workers' housing quarters in the Hughson area. Again, the agents had no warrant, no consent, and no exigent circumstances.

These entries fall squarely within the holding of *LaDuke v. Nelson*, 762 F.2d 1318 (9th Cir.1985) (warrantless searches of farm housing proscribed by fourth amendment), and appear to be illegal.

## INS INTERROGATIONS, DETENTIONS, AND SEIZURES

■ It remains to consider whether, once INS agents are on the premises, they engage in non-detentive sweeps such as those described in *Delgado*, or routinely seize workers in violation of the fourth amendment. As noted *supra*, the INS may question a worker on suspicion of mere alienage, may detain a worker on articulable suspicion of illegal alienage, and may

make an arrest if there is probable cause to believe that the person is an illegal alien.

The most instructive Ninth Circuit case for purposes of this motion is *Benitez-Mendez v. INS*, 760 F.2d 907 (9th Cir.1985) (as amended), in which the court reiterated its seizure test:

> [A] person has been 'seized' ... only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of weapons by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*Id.* at 908–09.

In *Benitez-Mendez*, a field worker did not run when three marked Border Patrol vehicles approached his workplace, and upon questioning he told the agents that his immigration documents were in his car. Agents placed him in a Border Patrol van while they examined his papers. Although the court found that the initial questioning did not constitute a seizure, placing him in the van did. "Once petitioner was placed inside the vehicle and told to wait, it is clear that he reasonably 'would have believed that he was not free to leave.'" *Id.* at 909.

The seizure was illegal, as the Border Patrol officer

> was not able to articulate objective facts providing a reasonable suspicion that Benitez-Mendez was an alien illegally in this country. The objective facts known to the officers at the time of petitioner's detention were that petitioner was a field worker whose co-workers had fled upon sight of a marked Border Patrol detail, that he was an alien, and that he claimed to possess documents showing his legal status.

*Id.* Significantly, the court held that

> Petitioner had not yet violated 8 U.S.C. § 1304(e), requiring an alien to "at all times carry with him and have in his personal possession any certificate of alien registration or alien registration receipt card issued to him...." Since petitioner stated that his papers were in his car, parked adjacent to the field, the officers should have afforded him the opportunity to produce the papers. Under the circumstances the papers were constructively in petitioner's personal possession. It was reasonable for petitioner to leave the papers in his car while he engaged in heavy agricultural labor. Only if the petitioner refused to produce the papers, or was unable to produce the valid papers, would he have committed a misdemeanor under § 1304(e), giving the INS officers probable cause to arrest him.

*Id.* at 909 n. 2.

A review of the record in this case in light of *Benitez-Mendez* and other pertinent authority suggests that while many INS agents conduct themselves in a professional manner during raids, it is not infrequent that others violate the fourth amendment rights of workers. There is considerable evidence, much of which is disputed by defendants, that INS agents often question suspects in a detentive manner and even effect seizures of workers during raids before any questioning to establish articulable suspicion of illegal alienage. The record also suggests that agents often are not inclined to allow suspects to produce documentation. A few of these alleged incidents are described here.

At Pacific Mushroom Farm on April 28, 1982, Rita Brambilla de Silva, Luisa Juarez-Esquivel, Evangelina Mendoza-Avalos, and Santos Gil Robles were seated in a mushroom shed taking a coffee break when approximately six agents entered and yelled in Spanish, "Don't move; you're under arrest; we're from immigration." Agents then proceeded to direct workers into two groups for questioning: those who had "papers" and those who did not.

Workers from Pacific Mushroom who were seized were taken handcuffed to vans

and then loaded onto a bus that took them to a nearby beach for questioning. When one worker, Ramon Estrada, declined to answer agents' questions, agents allegedly hauled him off the bus, gave him a full body search, twisted his arm behind his back, grabbed his hair, and slammed him against an INS vehicle. The other workers witnessed this and were allegedly told that the same thing would happen to them if they refused to answer questions.

One Pacific Mushroom worker, Antonio Garcia Diaz, told agents he had papers and in fact produced those papers. He was nevertheless forced into a van and then a bus. When Garcia declined to answer questions or sign papers before talking with his lawyer, he was forcibly removed from the bus and had his arm twisted behind his back. He feared that one agent was going to strike him until another intervened.

At Modern Mode, two workers, Javier Lascon-Cerda and Marcos Gutierrez-Arceo, were seized as they merely walked to the restroom at different times during the raid. Lascon-Cerda was grabbed, told to "get the hell over here," pushed to his knees, and handcuffed absent any suspicious activity or questioning. Gutierrez-Arceo was likewise seized without any questioning as he walked slowly to the mens' room. He was handcuffed, told to kneel, and then taken outside.

Defendants entered Petaluma Mushroom on April 26, 1982, blocked entrances to mushroom growing rooms where the pickers were working, handcuffed the workers inside, and lined them up outside against a wall to frisk them. No questions were asked, no papers were requested, and the workers were not permitted to volunteer information about their immigration status.

At Mammoth Lakes Lodge defendants seized plaintiff Antonio Sanchez-Vaca as he slept at night in his employer-supplied cabin. Agents awakened him by flashing a light in his face after entering the cabin without consent or warrant. Sanchez-Vaca was told to get up and only then was he asked if he had papers. Two other INS agents were stationed outside the door of the cabin.

At Neve Roses on April 26, 1982, approximately 12 agents and six vehicles entered the property rapidly and without warrant or consent. One worker who remained unaware of INS presence as he cut glass on the ground was grabbed and had his arm twisted behind his back before agents asked him any questions to establish reasonable suspicion of illegal alienage. At no time had the worker tried to flee; indeed, he was not aware of the raid until he was grabbed.

At Petaluma Poultry Processors on April 26, 1982, three different INS officers questioned Francisco Rivera as he continued working at this station on the poultry processing line. The first and second agents examined Rivera's letter from an immigration judge directing him to report to Vancouver, Canada, on May 19 to pick up his permanent residency papers and were satisfied. The third officer, however, stated that he did not "recognize the judge's signature" and would have to take Rivera outside. Rivera was handcuffed, despite protestations that his papers were in order and he was not going to run, taken out of the building by his belt, placed in a van, and locked inside.

Agents were informed twice by different Petaluma Poultry managers that Rivera was not an undocumented alien. When Bill Cuppoletti, maintenance supervisor, told defendants that Rivera was a legal resident, an agent called him an "SOB", told him to keep his mouth shut, and to stay away. John Malone, Rivera's supervisor, also told agents that Rivera was in the country legally, but officers responded that they did not care.

Manager Cuppoletti also described two Hispanic women who were arrested and were forced to walk back-to-back with tie wraps securing their arms. As they were being taken to the van, one of the women shouted to the agent that she had her green card. At the van, the tie-wraps were cut with difficulty and both women produced their green cards.

At Point St. George Fisheries, plaintiff Rodriguez, a lawful permanent resident, was seized for failing to produce immediately the green card that he did not carry on his person due to the messy nature of his work. Rodriguez' wife, a U.S. citizen, attempted to tell agents that her husband was lawfully in the United States, but was told to shut up. Rodriguez was handcuffed and left in a van for over 15 minutes until his wife returned with his passport and green card.

At Superior Plaster Casting, Felipe Ortiz, a 21-year old, lawful permanent resident, was grabbed by his arms by an INS agent during the raid. He was immediately handcuffed and searched up against a wall. This occurred after Ortiz explained to agents that he was a lawful resident, but had his green card at home. For fifteen minutes he was held in an INS car. Ortiz was released after agents made a radio call to INS headquarters.

As Raquel Zarazua-Medrano sat at her work table at Bell Industries on April 30, 1982, two INS agents entered the room and one positioned himself between her and the door. When asked where she was from, she answered "from here." The agent then began yelling at her, and she did not feel free to leave in order to avoid further interrogation due to the agent's position in front of the door.

Joseph Angel Chavez, a natural born U.S. citizen, was questioned repeatedly by different agents as he worked during the July raid at Benicia Foundry. He was asked where he was born by one agent and then left alone. A second agent questioned him and was also satisfied. These two conversations were conducted in English. A third agent, however, questioned Chavez in Spanish, and Chavez responded in Spanish. The agent seized him by the belt and forced him into an INS van, where he was held for the duration of the raid, driven around and ultimately released.

At some farm labor housing at Hughson, on July 18, 1983, at 9:30 a.m., Border Patrol agents entered the home of several workers without warrant or consent. The three agents were in uniform with visible pistols and badges. Agents remained in the house for ten minutes while documentation was demanded of all four residents.

Maria Socorro Araneta, a United States citizen and owner of a San Jose 7-11 store, was accosted in her store by an INS agent who demanded to see her papers. When Mrs. Araneta told him the date of her naturalization and explained that citizens are not required to carry papers, the agent told her that she was "obstructing justice" and remained in the store for more than an hour questioning Araneta and a friend.

Defendants' practices in the instant action, unlike the polite, casual questioning found by the Supreme Court in *INS v. Delgado*, include the use of threatening behavior and force to compel workers to answer questions, as well as the seizure of workers prior to any questioning. Also in contrast to *Delgado*, many of the workers here had a reasonable basis to believe that they were not free to leave. Whereas in *Delgado* workers "who simply went about their business in the workplace were not detained in any way," here many workers were grabbed, handcuffed, and/or thrown into vans, even when they were attempting to continue their work. In *Delgado*, workers were permitted to walk away after a few questions; here, workers were interrogated at length, at times by several different agents. There is also considerable evidence here, unlike *Delgado*, of significant workplace disruption caused by these raids.

Having considered this and all the other plaintiff testimony, as well as the considerable *contra* defense testimony, the Court finds that plaintiffs have at the very least raised a serious question as to whether defendants routinely violate the fourth amendment and 8 U.S.C. § 1357(a). There is considerable evidence that defendants often detentively question aliens as to whom they have no reasonable, articulable suspicion of undocumented status, and seize workers prior to any questioning, and in the absence of any other indicia that would establish probable cause for belief of illegal alienage.

INS SELECTIVE ENFORCEMENT

Plaintiffs allege that defendants detain and arrest workers solely on the basis of appearance of Hispanic ancestry and inchoate hunches. Some of the testimony suggests that agents do not even bother to question Asian or Caucasion workers during workplace raids, even if they are fleeing.

The Supreme Court noted in *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), that appearance is not enough for a stop:

> At best the officers had only a fleeting glimpse of the persons in the moving car, illuminated by headlights. Even if they saw enough to think that the occupants were of Mexican descent, this factor alone would justify neither a reasonable belief that they were aliens, or that the car concealed other aliens who were illegally in the country. Large numbers of native-born and naturalized citizens have the physical characteristics identified with Mexican Ancestry, and even in the border area a relatively small proportion of them are aliens. The likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor, but standing alone it does not justify stopping all Mexican-Americans to ask if they are aliens.

*Id.* at 886, 95 S.Ct. at 2582. *See United States v. Heredia-Castillo*, 616 F.2d 1147 (9th Cir.1980). Nevertheless, in *Gonzales v. City of Peoria*, 722 F.2d 468 (9th Cir. 1983), the Ninth Circuit noted that

> even if it were shown that Peoria police directed an unusual proportion of their law enforcement activities towards persons of Mexican descent, proof of the policies' disproportionate impact would not establish a violation of the equal protection clause. The plaintiffs were required to prove an intent to discriminate, explicit or implicit, to establish the claimed constitutional violation.

*Id.* at 480.

Although the record is replete with evidence that INS and Border Patrol agents use Hispanic appearance as a primary factor in selecting those individuals to question, the evidence is less clear that agents use this factor to the exclusion of all others, or rely on inchoate hunches rather than articulable suspicion of alienage. The evidence adduced by plaintiffs purporting to show that agents routinely ignore non-Hispanic workers is inconclusive. Indeed, there is credible evidence that in many instances agents do question non-Hispanic workers. Thus the Court cannot find on the evidence currently before it that plaintiffs raise a serious question or are likely to succeed on their equal protection claims. This finding does not preclude plaintiffs from further developing the record in this regard.

## THE AVAILABILITY AND SCOPE OF INJUNCTIVE RELIEF

 Taking the evidence as a whole, the Court is satisfied that plaintiffs at the very least have presented serious questions going to the merits of their fourth amendment claims and the evident systematic policy and practice of fourth amendment violations of defendants. It is also clear that the balance of hardships tips sharply in favor of plaintiffs. On the one hand, critical constitutional rights of the plaintiffs are in jeopardy for so long as defendants continue their current practices. On the other hand, defendants have not demonstrated that compliance with the fourth amendment will eviscerate their enforcement efforts. Even if such impairment were possible, the INS cannot be heard to complain that it will be injured by compliance with constitutional mandates. Further, due to the constitutional nature of the recurrent violations, plaintiffs are quite likely to suffer irreparable harm absent a preliminary injunction. *See LaDuke v. Nelson*, 762 F.2d 1318, 1330 (9th Cir.1985). Moreover, the record establishes the ongoing nature of these workplace raids, and that some of the plaintiffs and class members have been subjected to the challenged INS practices on more than one occasion. *Cf. LaDuke v. Nelson*, 762 F.2d 1318,

1323–26 (9th Cir.1985). Finally, because a class has already been certified, the scope of the injunction need not be limited to the named plaintiffs. *Cf. Zepeda v. INS,* 753 F.2d 719 (9th Cir.1985).

## PRELIMINARY INJUNCTION

Good cause appearing therefor, the Court preliminarily enjoins defendants and their officers, agents, and employees in the San Francisco District of the United States Immigration and Naturalization Service and the Livermore Border Patrol Sector as follows.

1. Each INS workplace entry, other than in public areas and open fields, must be based on at least one of the following: a valid warrant, a valid consent, or exigent circumstances not deliberately provoked by defendants' own conduct.

2. Every INS warrant must particularly describe each suspect to be questioned or seized pursuant to the particularity requirement of the fourth amendment. There must be probable cause to believe each such person is an alien illegally present in the United States. A warrant need not in every case identify the suspect(s) by name, but the warrant and its supporting affidavits must contain enough specific identifying information to assure that the search for that person is reasonably likely to result in finding that person.

3. A warrant may not provide that "others" may be searched and seized, if such "others" are unnamed or only conclusorily described by any supporting affidavits.

4. When possible, each warrant must describe the particular area(s) of the workplace where the suspect(s) are likely to be found, in light of the information available to the defendants.

5. Each warrant must provide that the agents executing the warrant, before searching any work area, must show the warrant to an authorized company representative, and ask that representative to produce the suspect(s) named or described in the warrant. Before the suspects are produced, agents may position themselves at exits and question or detain any workers attempting to flee. If the representative is unwilling or unable to produce those suspects within a reasonable time, agents may then enter the work area to search for the suspects. Such searches must be directed at finding the named or described suspects as quickly as possible, rather than for general questioning of the entire workforce. This does not preclude agents from questioning or detaining workers who attempt to hide or flee.

6. When agents have no warrant, but intend to obtain consent upon arrival at the worksite rather than ahead of time, they must not arrive or conduct themselves in a manner that would foreseeably provoke flight by workers, or that would leave a reasonable person with the belief that he had no choice but to consent to the raid. They must inform the representative of the nature and scope of the proposed survey. They may not expressly or impliedly suggest that the employer will face retaliation if he declines to consent.

7. Agents may not deliberately provoke flight by workers in order to justify entries onto workplace premises.

8. Absent a valid warrant or genuine exigent circumstances not deliberately precipitated by the agents themselves, agents may not detain workers without reasonable, articulable suspicion of illegal alienage. During non-detentive questioning, and before agents detain a worker, agents must give the worker a reasonable opportunity to produce his or her relevant documents, even if those documents are not on the worker's person but are in his constructive possession somewhere on the premises. Agents may accompany a worker who must retrieve his documentation.

9. Absent a valid warrant or genuine exigent circumstances not deliberately precipitated by the agents' own conduct, agents may not arrest a worker except upon probable cause, based on articulable facts and reasonable inferences drawn therefrom, that the worker is an alien unlawfully present in the United States and is

likely to escape before a warrant can be obtained for his arrest.

10. Defendants shall immediately provide a copy of this order to all officers located in the San Francisco INS District and Livermore Border Patrol Sector, and to any officer who hereafter becomes located in these districts during the time that this order is effective. Before any more workplace raids are undertaken, defendants shall orally brief each agent in the field regarding the terms of this injunction and their practical significance, and shall give each such agent his or her own copy of the terms of the injunction.

11. Agents seeking a warrant for workplace arrests must cite this opinion to the judicial officer issuing the warrant.

12. This Order supersedes the preliminary injunction order issued October 11, 1985, and will be in effect from October 29, 1985, until further order of this court or until resolution at trial on the merits.

Defendants' Motion for Stay Pending Appeal is denied.

IT IS SO ORDERED.