INTERNATIONAL MOLDERS' AND
ALLIED WORKERS' LOCAL
UNION NO. 164, et al., Plaintiffs,

v.

Alan NELSON, Commissioner of the
INS, et al., Defendants.

No. C–82–1986–RPA.

United States District Court,
N.D. California.

Nov. 24, 1987.

Susan E. Brown, Francisco Garcia–Rodriquez, Denise Hulett, Mexican American Legal Defense and Educational Fund, San Francisco, Cal., Antonia Hernandez, E. Richard Larson, Linda Wong, John Nockleby, Mexican American Legal Defense and Educational Fund, Los Angeles, Cal., David Grabill, California Rural Legal Assistance, Santa Rosa, Cal., Alan L. Schlosser, Margaret C. Crosby, Edward M. Chen, American Civil Liberties Union Foundation of North-

ern California, Inc., Steven A. Brick, Barbara Moses, Orrick, Herrington & Sutcliffe, John M. True, Employment Law Center, San Francisco, Cal., for plaintiffs.

Joseph P. Russoneillo, U.S. Atty., Judith A. Whetstine, Chief, Civ. Div., San Francisco, Cal., David J. Kline, Asst. Director, Ellen Sue Shapiro, Attorney Office of Immigration Div., Civ. Div., Dept. of Justice, Washington, D.C., for defendants.

## ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

AGUILAR, District Judge.

## I. INTRODUCTION.

The question before the Court is the validity and effect of a warrant issued by an United States Magistrate permitting defendant the Immigration and Naturalization Service (the "INS" or the "Government") to raid the workplace of plaintiff Petaluma Poultry Company ("PPC"). The Government argues that the warrant was valid, that it was properly supported by a specific and reliable affidavit, and that the actions taken pursuant to the warrant were justified. Plaintiffs counter by arguing that the warrant was inadequately supported, that the warrant itself was invalid, and that the subsequent seizure of illegal aliens by use of the warrant was illegal.

After full briefing and oral argument, the Court deemed submitted the parties' cross-motions for summary judgment. The Court has now reviewed all papers submitted in connection with the motions and reviewed the relevant authorities. Good cause appearing therefor, the Court finds and orders as follows.

## II. FACTS.

An overview of the facts is provided here. More complete details are provided in the earlier opinion of this Court, 643 F.Supp. 884 (1986), *remanded with modifications,* 799 F.2d 547 (9th Cir.1986).

This suit arises from a series of workplace raids conducted by the INS pursuant to their authority under the immigration laws. Plaintiffs challenge these raids as violative of the Fourth and Fifth Amendments to the Constitution. In the context of these motions, plaintiffs assert that the INS employed "warrants of inspection" as licenses generally to interrogate and seize employees. Plaintiffs allege that in a typical raid, the INS would block the exits from the work area and systematically question primarily hispanic workers about their immigration status. Although the warrant might refer to no more than four specific individuals, the INS would use the "general warrant" to interrogate and to seize employees or any other suspects *en masse* resulting in the arrest or detention of as many as seventy persons in a single workplace raid.

Although in their earlier motion for a preliminary injunction plaintiffs referred to eight separate incidents of raids, the Sixth Amended Complaint (the "Complaint") presently on file in this case refers to but a single occasion of a raid conducted pursuant to a general warrant. That incident was the raid on PPC. Thus, for purposes of ruling on the question of the validity of the INS' "general warrants" the only controversy presently before the Court is the raid on PPC.

The warrant used to gain entry to PPC was issued on April 23, 1982, by U.S. Magistrate Richard S. Goldsmith. Magistrate Goldsmith stated that there was "reasonable cause to believe" that five named individuals "and others" were illegally in the United States and could be found at PPC during normal working hours. The warrant authorized the INS:

To search within a period of ten (10) days the place named above for the persons specified, and other suspected of being illegal aliens, serving this warrant and making the search in the daytime (8:00 a.m. to 5:30 p.m.), and if such persons are found there to seize them, leaving a copy of this warrant and receipt for the persons taken, and prepare a written inventory of the person seized and promptly return this warrant and the written in-

ventory before Magistrate Richard S. Goldsmith, as required by law.

The sole basis for the issuance of the warrant was an affidavit sworn to by Joseph Brandon of the INS. Detailed examination of the affidavit is provided below. At this point, it is sufficient to note that the affidavit contained seven items in support of the request for a warrant. The gist of the affidavit was that illegal aliens had been apprehended at the PPC factory in 1978 and that there was evidence suggesting that illegal aliens were again on the premises. Solely on the basis of this affidavit, the magistrate issued the warrant.

## III. DISCUSSION.

### (A) *Seizure of the Five Named Alien Suspects:*

■ The first question is whether the warrant was valid as a seizure warrant with respect to the five named individuals.[1] The standard to test validity is whether the warrant and supporting affidavit contain sufficient specificity and reliability to prevent the exercise of unbridled discretion by law enforcement officers. *Delaware v. Prouse,* 440 U.S. 648, 653–55, 99 S.Ct. 1391, 1395–97; 59 L.Ed.2d 660 (1979); *see also U.S. v. Spilotro,* 800 F.2d 959, 963 (9th Cir.1986) ("The description [in the warrant] must be specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized."). The purpose of this requirement is "to prevent the agents from having uncontrolled discretion to rummage everywhere in search of seizable [persons] once

lawfully within the premises." *Int'l Molders,* 799 F.2d at 552–53, *quoting U.S. v. Condo,* 782 F.2d 1502, 1505 (9th Cir.1986).[2]

The evidence presented in a warrant application must be particularized enough to allow a "neutral and detached" magistrate or court, *Steagald v. U.S.,* 451 U.S. 204, 212, 101 S.Ct. 1642, 1647–48, 68 L.Ed.2d 38 (1981), to make an independent determination that probable cause exists for the seizure of a particular person. *Illinois v. Gates,* 462 U.S. 213, 239, 103 S.Ct. 2317, 2332–33, 76 L.Ed.2d 527 (1983) ("An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause.... [the magistrate's] action cannot be a mere ratification of the bare conclusions of others."); *Molders,* 799 F.2d at 552–53; *see also U.S. v. Rubio,* 727 F.2d 786, 795 (9th Cir.1984) ("The magistrate must be provided with sufficient facts from which he may draw the inferences and form the conclusions necessary to a determination of probable cause.").

■ As defendants correctly have pointed out, whether a warrant is adequate and based on probable cause are questions to be decided on the face of the warrant and its supporting affidavit. *U.S. v. Anderson,* 453 F.2d 174, 175 (9th Cir.1971), *cited with approval in U.S. v. Grandstaff,* 813 F.2d 1353–55 (9th Cir.1987). The warrant cannot be supported by outside or after-the-fact information. *U.S. v. Rubio,* 727 F.2d 786, 795 (9th Cir.1984). The facts upon which the magistrate predicates his probable cause determination "must appear with-

1. The Government argues that only PPC is challenging the validity of the warrant and that only PPC has standing to pose such a challenge. As plaintiffs pointed out at oral argument, all plaintiffs present at PPC during the raid are challenging this warrant. Their right to contest the validity of the warrant is discussed in the Court's prior opinion. *See* 643 F.Supp. at 889.

This case is distinguishable from *Martinez v. Nygaard,* 820 F.2d 1024 (9th Cir.1987), because *Martinez* involved a warrant that authorized only a search. The court ruled that employees had no standing to challenge the warrant to search their workplace. The target of the warrant was the workplace itself. In contrast, the employees here were the targets of a seizure warrant. Plaintiffs here certainly have a legit-

imate expectation of maintaining their own privacy—an expectation which seizure would severely compromise. *See Martinez,* 820 F.2d at 1027.

2. This precise concern was voiced over sixty years ago by the Supreme Court in *Marron v. U.S.,* 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927):

"The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant."

in the four corners of the warrant affidavit." *Id.; Grandstaff,* 813 F.2d at 1355.

The affidavit in this case contained sufficient particularized and reliable information to allow the magistrate to find probable cause for the issuance of the warrant with respect to the five named individuals. The Brandon affidavit stated that an October 1978 raid on PPC uncovered seventeen (17) illegal aliens employed by the company. Fifteen of the seventeen failed to appear for INS interviews, allegedly because of warnings of potential deportation given to the employees by PPC. The affidavit further states that on November 5, 1981, an anonymous informant reported that PPC was employing approximately thirty illegal aliens, many of whom had been arrested and deported previously. Among those thirty, was Enrique Farias, who the informant stated had been deported to Mexico once before. An examination of INS' records showed that Mr. Farias had indeed been deported before—on October 24, 1978, a date coinciding with the prior raid on PPC. Brandon's affidavit further related that the Petaluma Police Department had advised the INS that many illegal aliens were working at PPC.

When the INS attempted to follow up on these leads, PPC was not forthcoming with information. After PPC denied employment of illegal aliens, the INS subpoenaed PPC's personnel files. A review of the files revealed that five PPC employees had records of illegal status and prior apprehensions. Those five individuals—David Valencia–Mendoza, Jose Valencia–Mendoza, Audomaro Farias–Vargas, Enrique Farias–Vargas, and Baudelio Carrillo–Navarro—were then named specifically in the warrant as targets of seizure.

■ Thus, the affidavit, including the INS' records with respect to Mr. Farias and his four cohorts, contained specific and reliable information from which a neutral magistrate could find probable cause for the seizure of the five named employees suspected of being illegally present in the

U.S.. Based upon the information provided, the magistrate was able independently to surmise that probable cause existed for the search of the named individuals. *See Illinois v. Gates,* 462 U.S. at 239, 103 S.Ct. at 2332–33. Moreover, the warrant issued by the magistrate contained sufficient particularity (it actually named the five individuals) to prevent the INS from exercising unbridled discretion in seeking the suspects. *See Int'l Molders,* 799 F.2d at 552. In light of these facts, "the magistrate had a substantial basis for concluding that probable cause existed." *Gates,* 462 U.S. at 238–39, 103 S.Ct. at 2332; *quoting Jones v. U.S.,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960). Therefore, the warrant is constitutionally valid insofar as it permitted the INS to seek out and arrest the five individuals named in the affidavit in support of the warrant.

(B) *Seizure of "[O]thers Suspected of Being Illegal Aliens":*

■ The same legal standards mentioned above must be applied to the affidavit and warrant vis-a-vis seizure of the ten people seized on April 23, 1982, who were not named in the warrant.[3] Defendants try to avoid this determination in at least two ways. First, the INS alleges that the warrant was designed to permit inspection, not seizure. Indeed, the warrant used to enter PPC's business premises was dubbed a "warrant of inspection." However, it is clear that it is properly described as a "general warrant." The "general" aspect of the warrant is that it does not name all of those to whom it was intended to apply; instead, the warrant mentions five specific individuals and refers to "others." Furthermore, the warrant authorized far more than simply inspection. If the INS found the specified individuals or "others suspected of being illegal aliens," the INS was authorized "to seize them." In fact, seizure of illegal aliens was a chief purpose of the INS' "Operation Jobs." Because both in intent and practice the INS' warrants

---

**3.** "Plaintiffs' Statement of Material Facts Not On [sic] Dispute," filed on August 14, 1987, at page four, reports that fourteen people were arrested during the raid on PPC on April 23, 1982. Only four of the fourteen people were named in the warrant.

were aimed at seizure of illegal aliens, it is a misrepresentation to describe them merely as "warrants of inspection." Accordingly, the Court adopts the nomenclature of plaintiffs and henceforth will refer to the PPC warrant as a "general" or "open-ended" warrant.

The second argument advanced by the INS to avoid judicial pronouncement on this issue of seizure of the ten unnamed individuals is that the warrant, as a matter of law, could authorize only entry. Defendants make this concession in their papers now as they did earlier in their appeal to the Ninth Circuit. The concession and its consequence are elaborated in the circuit's opinion:

> [T]he INS concedes that the warrants could properly authorize only entry into the workplace to question suspect aliens.... Having now taken this position, INS cannot object to a permanent injunction that prohibits warrants to seize suspected aliens unless the warrants meet the particularity requirements applied to arrest warrants.[4]

■ Despite the INS' Orwellian attempts to contradict the literal language of the warrant by describing it as an "inspection warrant," it is undeniable that the warrant gave the INS the authority to seize unnamed persons suspected of having illegal statuses. No matter how the INS wishes to recast, recharacterize, or otherwise misrepresent the warrant, it remains true that the warrant was fundamentally a license for the INS to seize people simply because they were "suspected of being illegal aliens," whatever that means. Under the Ninth Circuit's ruling in this case and the unambiguous language of the Supreme Court in *Ybarra*, the Court concludes, once again[5], that the warrant unconstitutionally authorized seizure of persons without probable cause. In this respect, the warrant was patently invalid. Defendants are permanently enjoined from seeking or employing such warrants in the future.

### (C) The Warrant's Invalidity Cannot Be Purged By Post-Facto Conduct:

■ The Government argues that "the INS used the warrants of inspection solely for entry purposes and, after entry, independently developed the probable cause to arrest illegal aliens." *Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment* at 15:10–13. Thus, according to the INS, "even if the warrant is somehow defective, no legal violations occurred." *Id.* at 15:13–14.

The flaw in this argument is that once the warrant is found invalid, the INS' presence inside PPC is no longer legally supported.[6] Without consent, a warrant, or probable cause along with some sort of exigent circumstance (which has not been argued or shown here), the INS was not legally entitled to enter the premises. As this and other circuits have ruled on numerous occasions, a "lack of probable cause cannot be made up in hindsight by a hypothetical variation in the basis on which

---

**4.** The circuit panel went on to articulate the established standard for the issuance and validity of such warrants:

> To the extent the warrants authorize INS to seize employees, the Supreme Court's holding in *Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), requires "probable cause *particularized with respect to that person.*" *Id.* at 91, 100 S.Ct. at 342 (emphasis supplied by circuit panel). "This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be." *Id.*

**5.** *See* 643 F.Supp. at 894:

> The Court finds as a matter of law that to the extent the defendants rely on these warrants

to search for and arrest unidentified and unknown "others," these warrants violate the fourth amendment and are invalid.

**6.** *See Massachusetts v. Sheppard,* 468 U.S. 981, 988 n. 5, 104 S.Ct. 3424, 3428 n. 5, 82 L.Ed.2d 737 (1984):

> The uniformly applied rule is that a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional. [citations omitted] That rule is in keeping with the well-established principle that "except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Camara v. Municipal Court,* 387 U.S. 523, 528–29, 87 S.Ct. 1727, 1731, 18 L.Ed.2d 930 (1967).

a search was conducted." *U.S. v. Branch,* 545 F.2d 177, 186 n. 24 (D.C.Cir.1976), *quoting U.S. v. Cunningham,* 424 F.2d 942, 943 (D.C.Cir.1970), *cert. denied,* 399 U.S. 914, 90 S.Ct. 2218, 26 L.Ed.2d 572 (1970); *see also Llaguno v. Mingey,* 739 F.2d 1186, 1191 (7th Cir.1984) ("The officers needed probable cause *before* they entered the house." (emphasis in original)), *vacated on different grounds after rehearing en banc,* 763 F.2d 1560 (7th Cir.1984), *cert. dismissed,* —— U.S. ——, 107 S.Ct. 16, 92 L.Ed.2d 783.

This principle has been affirmed by this circuit in *U.S. v. DiCesare,* 765 F.2d 890 (9th Cir.1985), *modified on other grounds,* 777 F.2d 543 (9th Cir.1985). In *DiCesare,* the court ruled that "the acquisition of probable cause during an unlawful seizure does not cure the illegality and does not constitute an independent source of probable cause." 765 F.2d at 899. *See also U.S. v. Taheri,* 648 F.2d 598, 600–01 (9th Cir. 1981). Hence the contention that the INS, in effect, successfully "hedged its bet" once inside PPC by conducting "surveys" of the sort authorized in *Delgado,* 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984), cannot be permitted to obfuscate the fact that it was the warrant that allowed the INS inside the factory in the first instance. The fact that the warrant was invalid cannot be circumvented, nor the warrant resuscitated by the INS' tactics once inside the factory.

(D) *The Warrant as a Warrant of Inspection:*

■ Notwithstanding the conclusion that the warrant was for seizure, the Court will go on to consider the warrant as a warrant

of inspection. For despite the fact that the warrant in this case is invalid insofar it purported to authorize indiscriminate seizure of any person who was suspected of being an illegal alien, there remains the possibility that the warrant could be upheld in part, as a warrant of inspection.[7] In order to make this determination, the standard to be applied is that articulated in *Blackie's House of Beef v. Castillo,* 659 F.2d 1211 (D.C.Cir.1981), *cert. denied,* 455 U.S. 940, 102 S.Ct. 1432, 71 L.Ed.2d 651 (1982). In order to be valid:

> [The] warrant and accompanying affidavits [must] narrow[ ] down the field of potentially vulnerable persons to those employees whom INS agents might reasonably believe to be aliens.

659 F.2d at 1226.

The standard constructed in *Blackie's* was adopted by this circuit in its review of this Court's preliminary injunction ruling. See 799 F.2d at 553. The panel appeared to adopt the standard reluctantly, noting that the litigants were not able to propose a viable alternative. *Id.* The Court also observed that the Supreme Court did not expressly decide the particularity requirement for an entry warrant used in INS factory raids in *INS v. Delgado,* 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984), instead leaving the question open to the circuits. *Id.* n. 6. Instead of using this as a basis to explore for a viable alternative to *Blackie's,* the Court stated that the Supreme Court in *Delgado* "made explicit reference to the agents' lawful presence in the factories based on warrants that did not identify *any* suspected illegal aliens by name. (emphasis in original). *See* 466 U.S.

---

**7.** In review of this Court's preliminary injunction, the Ninth Circuit seemed to indicate that it is willing to review the warrant according to its characterization by the INS. Thus, in footnote five, despite the fact that this Court's finding that the warrants authorized seizures was "amply supported by the record," the circuit panel found it "unnecessary ... to decide whether the hybrid probable cause standard that *Blackie's* applied to entry warrants should apply to warrants that, on their face, authorize seizure of suspected illegal aliens." 799 F.2d at 552 n. 5.
  With all due respect, this Court has concluded once again that this warrant does authorize sei-

zure—indeed, it is a seizure warrant—and it is not enough passively to accept the INS' good-faith mischaracterizations. Furthermore, this Court submits that the circuit panel decided precisely what it said it need not, i.e., that any warrant which authorizes seizures must be supported by "probable cause *particularized with respect to that person.*" 799 F.2d at 552 n. 5, *quoting Ybarra,* 444 U.S. at 91, 100 S.Ct. at 342 (emphasis added by circuit panel). Accordingly, the warrant here is invalid as to all but the five named individuals.

at 212, 217 n. 4, 104 S.Ct. at 1763 n. 4 [sic, means n. 5]." What the Court failed to mention was that the issue of the validity of the warrant in *Delgado* was *explicitly* not decided by the Ninth Circuit panel prior to the appeal. *See International Ladies Garment Workers' Union, AFL–CIO v. Sureck*, 681 F.2d 624, 629 (9th Cir.1982), *reversed sub nom. INS v. Delgado*, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247. Furthermore, Justice Rehnquist in writing for the majority explicitly noted that the "warrants were issued on a showing of probable cause by the INS," a fact that immediately distinguishes *Delgado* from any case involving application of *Blackie's* "hybrid" standard of review.

These observations aside, the fact remains that *Blackie's* has been adopted by this circuit and it is the controlling law in this case. The question presented is whether under that standard the warrant in this case can pass muster as a "warrant of inspection." The Court concludes that the warrant here, even if limited to allowing entry for purposes of inspection, is deficient as a matter of law.

To begin with, the warrant is distinguishable from the warrant in *Blackie's* on the basis of the facts in the cases. Second, this warrant is deficient under the legal standard identified in *Blackie's*. Finally, the warrant in this case needlessly threatens the Fourth Amendment rights of others present in the targeted workplace.

**(i) *The Factual Distinction Between this Case and Blackie's:***

*Blackie's* involved INS raids on a restaurant in Washington, D.C. Two raids were conducted, the second following upon the district court's suppression of the evidence procured in the first raid. After the second raid was struck down by the lower court, the Government appealed to the D.C. Circuit. For purposes here, only the second warrant, which was based on the INS' statutory authority, is relevant.

Although it made no reference to seizure,[8] the warrant in *Blackie's* was similar to the warrant in this case. Both warrants specified the place to be searched, the period of time within which the search had to be completed, and the time period during the day in which the search could be undertaken. In these respects, the warrants are not distinguishable in any significant way.

What does distinguish the warrants are not the warrants themselves, but rather the affidavits supporting the warrants. In *Blackie's*, the INS assembled an impressive corpus of information which was presented to the magistrate. An informant who had worked at Blackie's swore on personal knowledge that approximately twenty other illegal aliens were employed there. A second affidavit from an apprehended alien who had worked at Blackie's verified information in the first affidavit, and named "Regelio" and "Pedro" as two of many illegal Hispanics currently employed at the restaurant. The INS also apprehended two illegal aliens who were carrying wage statements from *Blackie's*. One of the two supplied a third affidavit stating that Blackie's was employing illegal aliens from El Salvador and Africa, and related the first names of three of those employees.

After the district court threw out the first warrant (which was based on the foregoing information) because of lack of specificity in the warrant itself, the INS redoubled its investigative efforts. First, the INS received a fourth affidavit from a previously reliable source reporting that thirty or more illegal aliens were currently employed at Blackie's. This affidavit provided specific details including names of suspected illegal aliens, places they might be hiding, and evidence suggesting that these persons were in the United States illegally. Next, an INS agent "staked out" Blackie's for several hours on successive days. The agent observed employees both inside and outside the restaurant. The agent swore to his belief that many of the employees

---

**8.** This distinction alone, in this Court's view, is determinative. The comparison between the two warrants is an "apples versus oranges" proposition simply by virtue of what the war- rants authorized. Nevertheless, in deference to the circuit, the Court will simply ignore the distinction in the discussion that follows.

were illegal aliens because of their attire and apparent inability to speak any language except Spanish. Three days after the first agent completed his stake out, a second agent surveyed Blackie's during working hours. The agent observed numerous persons "of apparent Hispanic descent entering through the back doors of the restaurant." 659 F.2d at 1215.

In addition to this first hand information, an INS agent's affidavit provided to the Magistrate swore that the INS had apprehended forty eight (48) illegal aliens at Blackie's in the preceding five years. The agents supplemented this affidavit with a clipping from a *Washington Post* news story which reported the manager of Blackie's as having stated that he hires foreign workers.

Totalling up this information, the magistrate was presented with six affidavits, five of which contained first-hand testimony. Among the affiants were individuals who had worked or were working at Blackie's, a reliable informant with detailed information, and two INS agents who personally observed the situation at Blackie's. Among the material information procured were pay stubs from Blackie's on the persons of two illegal aliens, INS records showing Blackie's history of employing illegal aliens, and a news article containing essentially an admission of hiring illegal aliens by the manager of Blackie's. Interspersed through all this information were names of suspected illegal aliens working at Blackie's, descriptions of their person and their clothing, and identification of where these suspects might be hiding on the premises of the restaurant.

The information submitted in support of the warrant in *Blackie's* stands in sharp contrast to the warrant application in this case. Whereas the INS provided the magistrate with six affidavits and several potent pieces of documentary evidence in *Blackie's*, here the INS could muster but a single affidavit. Worse still, Joseph Brandon's affidavit is not based on personal knowledge; instead it consists of cullings from the INS' files. Of the seven pieces of information, two items are three and one-half year old references to a single incident in the past wherein illegal aliens were discovered at PPC. One of the tips received indicating the presence of illegal aliens at PPC was anonymous and general. The only other tip was received from the Petaluma Police Department, but this in turn was admittedly based upon "numerous anonymous calls" none of which the police corroborated. Finally, employment records at PPC did indicate that five employees of PPC were illegal aliens, but no grounds are set forth for a belief that others also were employed there.

Unlike *Blackie's*, the supporting material in this case contains no first-hand information, neither from informants nor INS agents. Both in terms of quality and quantity, the supporting material for the warrants in the two cases is radically different. On this factual basis alone, this case is distinguishable from *Blackie's*.

(ii) *The Warrant Fails Under the Blackie's Standard:*

These factual distinctions have significant legal implications. The most obvious is that this warrant simply fails to meet the standard in *Blackie's*. In sizing up the second warrant in *Blackie's*, the D.C. Circuit placed considerable weight on the body of information accompanying the warrant. The Court stated:

> Taken in conjunction with the warrant, which authorized the INS to enter the premises and make a search ... these papers established that the INS agent were empowered to enter Blackie's only for the purpose of questioning those employees whom the agents might reasonably suspect of being illegal aliens.... This warrant and accompanying affidavits narrowed down the field of potentially vulnerable persons to those employees whom INS agents might reasonably believe to be aliens.

659 F.2d at 1226.

In other words, the Court interpreted the warrant to incorporate the affidavits which formed the basis for the warrant application. This is consistent with the Supreme Court's decision in *Massachusetts v. Shep-*

*pard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed. 2d 737 (1984).[9] This approach was the D.C. Circuit's method of satisfying the requirement that the warrant must "advise the [subject] of the scope and objects of the search, beyond which limits the [officer] is not expected to proceed." 659 F.2d at 1217, *quoting Marshall v. Barlow's, Inc.,* 436 U.S. 307, 323, 98 S.Ct. 1816, 1825–26, 56 L.Ed.2d 305 (1978). In *Blackie's,* the supporting affidavits functioned to flesh out the scope and nature of the investigation. The manifold affidavits told the Government information about the suspects' identities, their features, their appearance including type of clothing, and likely hiding places. All of this information was read into the warrant, acting as a safeguard to assure that the individual's reasonable expectation of privacy was not "subject to the discretion of the official in the field." *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979), *quoting Camara v. Municipal Court,* 387 U.S. 523, 532, 87 S.Ct. 1727, 1732–33; 18 L.Ed.2d 930 (1967).

No such safeguards were present in this case. On its face, the warrant is quite similar to that in *Blackie's.* However, unlike Blackie's, when the warrant is sized up in connection with its supporting application, it is toothless. The INS agents here had no facts with which to fill in the details of who these "others suspected of being illegal aliens" might be, what their names were, what they were wearing, or where they might be hiding. To uphold a search on the basis of the sparse information provided here would be to apply a hybrid standard so eviscerated as to constitute little more than an administrative warrant standard.

### (iii) *The Threat to the Fourth Amendment Rights of Others:*

On the balance of interests that is supposed to characterize the trade off between the government's need to enforce the law and the individual's right to freedom and privacy,[10] the magistrate assigned disproportionate weight to the Government's position. In contrast to the magistrate in *Blackie's,* the magistrate in this case did not have enough information to enable him to make an intelligently informed decision. Although the standard here is not the traditional "probable cause" of the ordinary search warrant, a constant requirement is that the application for a warrant "must have sufficient specificity to enable the judge to make an *independent determination* of whether" the standard for the issuance of the warrants has been satisfied. *Molders,* 799 F.2d at 552 (emphasis in original). Without such information, the magistrate could not assess the competing law enforcement and privacy value. Absent a reasonable balance, this Court must find that the relevant standards were not met to justify the issuance of the warrant. In terms of the *Blackie's* standard, the warrant and supporting affidavit did not contain "sufficient specificity and reliability to prevent the exercise of unbridled discretion by law enforcement officials." 659 F.2d at 1225.

## IV. CONCLUSION.

As discussed above, the warrant used to raid PPC was a seizure warrant. The warrant did authorize the INS to "search," but the purpose was not to inspect but rather

---

**9.** *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984) is a companion case to *U.S. v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), wherein the Supreme Court created a "good faith exception" to the exclusionary rule. The Court then relied upon that exception in *Sheppard* to find that a defective warrant containing overbroad authorization for a search of a suspect's home would not result in the suppression of evidence that had been specifically mentioned or described in the affidavit accompanying the warrant. The Court ascribed no significance to the fact that the affidavit had not been incorporated explicit-

ly into the warrant. For a discussion of *Sheppard* see 1 Ringel, *Searches & Seizures, Arrests and Confessions* § 5.6 at 5–27 to 5–29 (Clark Boardman Co., Ltd. 1987).

**10.** *See Delaware v. Prouse,* 440 U.S. at 654, 99 S.Ct. at 1396 ("[T]he permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." [citations omitted] ).

to seize. Once "others suspected of being illegal aliens" were *found,* seizure was authorized—without any inquiry into whether the suspicion was correct. Under the relevant precedent, the warrant is invalid. Moreover, even if it is scrutinized under the relaxed "hybrid" criterion of *Blackie's,* the warrant is deficient. The warrant and the supporting affidavit simply did not provide enough information to place limits on the unbridled discretion of the INS. Absent such a check, the warrant was constitutionally infirm and its execution violated the Fourth Amendment rights of the plaintiffs present at PPC. Therefore, the Court hereby grants plaintiffs' motion for partial summary judgment concluding that the warrant used at PPC was invalid. Defendants' motion for partial summary judgment is hereby denied.

IT IS SO ORDERED.