**PEARL MEADOWS MUSHROOM FARM, INC., et al., Plaintiffs,**

v.

**Alan NELSON, et al., Defendants.**

**No. C 82–1896 RPA.**

United States District Court, N.D. California.

Aug. 24, 1989.

Joseph P. Russoniello, U.S. Atty., and Patrick Ramirez S. Bupara, Asst. U.S. Atty., San Francisco, Cal., and David J. Kline, Asst. Director, Parker Singh and Norah A. Schwarz, Attys., Office of Immigration Litigation, Civ. Div., Dept. of Justice, Washington, D.C., for plaintiffs.

John M. True, Employment Law Center, San Francisco, Cal., for defendants.

### AMENDED ORDER DENYING RULE 41(b) MOTION

AGUILAR, District Judge.

Plaintiffs allege that the Immigration and Naturalization Service (INS) has engaged in a pattern and practice of carrying out workplace raids in violation of the Fourth Amendment. The INS and Border Patrol agents arrive at workplaces in such a manner so as to provoke exigent circumstances to justify a warrantless entry. Otherwise, the agents enter with constitutionally deficient warrants, or without warrants and without consent. Consent, when requested, is coerced or involuntary. Once inside, the agents target employees of Hispanic appearance for questioning and detention, whether or not the agents have

reasonable, articulable suspicion of illegal alien status. Workers are forcibly detained and arrested without probable cause.

A preliminary injunction was issued in 1985, enjoining defendants from conducting workplace raids in a manner which would provoke exigent circumstances. The injunction ordered that INS entries onto workplaces must be based on either a valid warrant or valid consent. Detentive questioning of workers must be based on articulable reasonable suspicions of illegal alienage. Agents may not arrest a worker except upon probable cause. *International Molders' v. Nelson*, 643 F.Supp. 884 (1986), *remanded with modifications*, 799 F.2d 547 (9th Cir.1986).

After four calendar months of trial, plaintiffs have closed their case-in-chief. Defendants now move for a Rule 41(b) dismissal of the action. After hearing oral argument on the motion, the Court denied the motion from the bench. This Order serves to provide explanation for the Court's ruling.

For the purposes of this Order, the Court has only addressed those claims which required some explication of the applicable law and a determination of the appropriate burden of proof. The Court is unable, in this short order, to address each of the minor issues raised in the over 300 pages of briefing.

## I. DISCUSSION

### A. *Legal Standards*

Under F.R.Civ.Pro. 41(b), the trial court judge, sitting as the finder of fact, may review the evidence and its weight and issue judgment for defendant if plaintiff has not shown a right to relief. The trial judge has the discretion to grant a Rule 41(b) motion even if plaintiff has made out a prima facie case, if the evidence prepon-

derates against the plaintiff. *S.E.C. v. Murphy*, 626 F.2d 633, 658–59 (9th Cir. 1980).

The Court has received, read and considered the extensive briefing submitted on this motion, it has painstakingly reviewed the complaint, trial transcript and its own copious notes. In addition, the Court heard the oral argument of counsel. Good cause appearing therefor, the Court finds that plaintiffs have shown not only a prima facie case on their claims, but also that the evidence preponderates in their favor at the close of their case-in-chief.

### B. *Plaintiffs' Standing*

This suit challenging the INS' practices during work place raids is brought by five employers and a certified class of "persons of Hispanic or other Latin American ancestry ... subjected to the policies, practices and conduct of the INS and/or Border Patrol during the course of INS area control operations directed at places of employment." Defendants argue that plaintiffs, as named employers and class representatives, have failed to show they have standing to pursue the asserted claims.

#### (1) *Are the class representatives Hispanic?*

Defendants contend that plaintiffs Edward Armstrong, Francisco Rivera, Evangelina Mendoza Avalos, Antonio Sanchez–Vaca, and Jose Rodriquez have failed to show they are "persons of Hispanic or other Latin American ancestry" and as such, cannot represent the class.[1] According to defendants, the class-wide claims must be dismissed in the absence of testimony from a representative with standing as an Hispanic.

Edward Armstrong is not alleged to be a class representative in the Seventh Amended Complaint. Although plaintiffs noted this in the opposition papers, defendants

---

**1.** Although defendants vigorously opposed class certification, at no time did they attack or question the class representatives' status as Hispanics capable of adequately representing the class. *International Molders' v. Nelson*, 102 F.R.D. 457 (N.D.Cal.1983) (Order granting class certification.) In essence, defendants are bringing a

motion to decertify the class. Whether the Court considers the motion one for decertification or non-suit, the results are the same—plaintiffs have standing and can adequately represent the class of persons of Hispanic or Latin American ancestry.

reiterated their assertions that Edward Armstrong had failed to show he was Hispanic, in their reply memorandum. Edward Armstrong's racial status is irrelevant to the class claims.

At first glance, defendants' attack on the remaining class plaintiffs appears frivolous and an exercise in re-stating the obvious. Defendants note that the Court cannot take judicial notice of plaintiffs' racial status. This admonition notwithstanding, the Court, as trier of fact, is competent to make this finding based on the pleadings and evidence submitted at trial.

In their complaint, plaintiffs asserted they were Hispanics of Mexican and Salvadoran descent. All the class representatives have Spanish surnames. The Court observed these plaintiffs testify at trial, their physical characteristics denote Hispanic heritage. In addition, the witnesses spoke Spanish and testified through interpreters. Based on the Court's observations, and in the absence of evidence to the contrary, the Court finds that Joseph Angel Chavez, Francisco Rivera, Evangelina Mendoza Avalos, Antonio Sanchez–Vaca, and Jose Rodriquez are "persons of Hispanic or Latin American ancestry" and possess standing to represent the class.[2]

Rogelio Lona did not testify at trial and no evidence was presented relating to Mr. Lona. Mr. Lona is HEREBY DISMISSED from the case.

(2) *Plaintiffs' Standing To Object To A Pattern And Practice Of Using Constitutionally Infirm Warrants*

■ The Court has not certified an employer class. Accordingly, the named employer plaintiffs must have standing to object to the entry of the INS onto business premises where the class members are employed. Only the owner or manager of the business has standing to object to unlawful entries. *Rakas v. Illinois*, 439 U.S. 128, 133–34, 99 S.Ct. 421, 424–26, 58 L.Ed.2d

387 (1978) (Fourth Amendment rights may not be vicariously asserted.) As this Court has previously held, although the employee class members have suffered injury from the allegedly unconstitutional interrogations, detentions, and seizures, "the corporate entities have their own rights to assert based on the alleged warrantless entries, improper warrants, coerced consent or fabricated exigent circumstances involving their properties." *International Molders' v. Nelson*, 643 F.Supp. 884, 889 (N.D. Cal. 1985) (Order granting preliminary injunction). In that Order, the Court ruled that "all plaintiffs have standing." *Id.* The employers have a personal stake in the litigation and an expectation of privacy in their business establishments. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 311, 98 S.Ct. 1816, 1819–20, 56 L.Ed.2d 305 (1977) (Constitutional protection of commercial establishments is historically rooted in the Fourth Amendment.) At the same time, however, the employers are seeking injunctive relief, and this Court may, and must, look to evidence of a pattern of unlawful activity to determine whether injunctive relief is appropriate. *See Allee v. Medrano*, 416 U.S. 802, 815, 94 S.Ct. 2191, 2200, 40 L.Ed.2d 566 (1973). The inquiry necessarily entails taking evidence of INS conduct at other businesses not named as plaintiffs.

Plaintiff Petaluma Poultry asserts the claim that the INS enters workplaces with general warrants that provide for the seizure of named employees and "others," without particularized probable cause to arrest those unnamed workers.

Defendants argue that this claim must be dismissed because Petaluma Poultry, the only named plaintiff subjected to a general warrant, did not testify at trial. Although several witnesses testified to the events occurring at Petaluma Poultry, none of the witnesses asserted they were testifying on behalf of the business. According to defendants, it follows that plaintiffs

---

**2.** In addition, the class has already been certified and the class claims may be prosecuted regardless of the mootness or validity of the claims of the individual class representatives. *United States Parole Commission v. Geraghty*, 445 U.S. 388, 403, 100 S.Ct. 1202, 1212, 63 L.Ed.2d 479 (1980). Once certified, the class acquires an independent legal status. *LaDuke v. Nelson*, 762 F.2d 1318, 1322 n. 3; *Kuahulu v. Employers Insurance of Wausau*, 557 F.2d 1334 (9th Cir.1977).

failed to produce any witness with standing to challenge the entry into Petaluma Poultry premises.

Defendants have confused the evidentiary proof needed to meet the standing requirement. Defendants' attack does not focus on plaintiffs' showing of an injury or a personal stake in the litigation, but rather on whether plaintiff has authorized the suit. Plaintiff Petaluma Poultry, the business, has initiated and prosecuted this suit.[3] In the complaint, plaintiff Petaluma Poultry contests the use of the general warrant. Petaluma Poultry is not under a duty to send a business representative to reiterate that challenge at trial. Petaluma Poultry is already represented through counsel. The standing requirement is met if Petaluma Poultry can produce evidence of injury resulting from the allegedly unconstitutional activity. *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).

That question has already been answered in the affirmative. On November 24, 1987, this Court granted summary judgment in favor of Petaluma Poultry's claim that the general warrant used in the raid of its business establishment was constitutionally infirm, both as an inspection warrant and as a seizure warrant. *International Molders v. Nelson,* 674 F.Supp. 294 (N.D.Cal. 1987). Subsequently, plaintiffs amended their complaint to allege a claim that as a pattern and practice, the INS employs general warrants to gain entry to businesses and seize unnamed "others".

At trial, plaintiffs submitted evidence of the use of general warrants at thirty-one different businesses. This evidence establishes the claim that the INS has a pattern and practice of using general warrants to secure entry into workplaces. Through this evidence, plaintiffs are not attempting to vicariously assert the rights of others, but are instead producing material and relevant evidence necessary to establish a right to injunctive relief. *Allee v. Medrano,* 416 U.S. at 815, 94 S.Ct. at 2200; *City*

*of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).

■ Defendant raises the same flawed standing argument to attack the first, second, third, fourth and fifth claims for relief. Each of these claims challenges the constitutionality of the INS' entry into plaintiffs' businesses. Once again, defendants do not purport to allege that the named employer plaintiffs do not have an expectation of privacy in the businesses. Instead, defendants assert that the named plaintiffs' failure to testify at trial defeats whatever standing they may possess. The Court holds that direct testimony from a named plaintiff is not required if the necessary elements of the asserted claim are adduced through the testimony of other witnesses.

■ In this instance, based on the pleadings and the evidence submitted at trial, plaintiffs have met this burden and possess standing to pursue their first, second, third, fourth and fifth claims for relief.

### C. *Plaintiffs Have Shown A Persistent Pattern Of Unlawful Entries Into Workplaces*

The Court has previously determined that the use of open ended warrants of inspection as a means of gaining entry into workplaces for dragnet-style questioning and seizures of large numbers of workers at a particular cite is unconstitutional. At this point, the Court must determine whether the raids conducted without a warrant meet constitutional mettle. Defendants argue that the warrantless searches were conducted with the consent of the proprietors of the businesses. Plaintiffs assert that this consent was either lacking, limited, or obtained through coercion.

#### (1) *Warrantless Entries Without Consent*

Plaintiffs' first claim for relief alleges that defendants' have a policy, custom and practice of entering business premises without a warrant, without consent and

---

**3.** If defendants are asserting that Petaluma Poultry's authorization for this suit is a sham, deficient or non-existent, they must produce some evidence to substantiate this serious charge.

without exigent circumstances. The Fourth Amendment prohibits warrantless intrusions into non-public areas unless a recognized exception to the warrant requirement is established. *Marshall v. Barlow's Inc.*, 436 U.S. at 312–13, 98 S.Ct. at 1820–21. Although 8 U.S C. § 1357 authorizes INS agents to question and seize suspected aliens, the agents are nevertheless constrained by the protections of the Fourth Amendment, *Zepeda v. INS*, 753 F.2d 719 (9th Cir.1985), including the warrant requirement.

All but seven of the eighty-eight raids conducted during the week of Operation Jobs were warrantless raids. Nineteen of the workplace raids covered at trial were warrantless raids. Plaintiffs assert that ten of the raids were conducted without any consent. (Neve Roses, Petaluma Mushroom, San Jose Brick, American Electro Finishing, Sweet Sensations, El Torito, Monterey Restaurant, Skylark Nurseries, RJF Enterprises and Oneto Metals).

■ Defendant argues that no warrant was required at Skylark Nurseries, Neve Roses, Petaluma Poultry, American Electro, RJF Enterprises, or San Jose Brick because there is "no such thing as Constitutional protection for commercial curtilage." Defendants assert that the holdings of *Dow Chemical v. United States*, 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1985) and *Oliver v. United States*, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) taken together suggest that there is no constitutionally justified expectation of privacy violated by the INS's entries onto premises not enclosed by building walls.

*Oliver v. United States* reaffirmed the holding that "'the special protection accorded by the Fourth Amendment to the people in their persons, houses, papers, and effects is not extended to the open fields.'" 466 U.S. at 176, 104 S.Ct. at 1740 (quoting *Hester v. U.S.*, 265 U.S. 57, 59, 44 S.Ct. 445, 446, 68 L.Ed. 898 (1924)). In *Oliver*, a field of marihuana over a mile from the house and fenced in marihuana patches located in the woods behind a house were found to be open fields undeserving of Fourth Amendment protection. The Court distinguished these open fields from curtilage, wherein a person would have a reasonable expectation of privacy. The curtilage of a home has always enjoyed an expectation of privacy. In contrast, "[t]hese fields, by their very character as open and unoccupied, are unlikely to provide the setting for activities whose privacy is sought to be protected by the Fourth Amendment." 466 U.S. at 179, n. 10, 104 S.Ct. at 1742, n. 10. However, the opinion contained no reference to whether commercial curtilage should enjoy the same protections afforded the curtilage of a private residence.

In *Dow Chemical Co. v. United States*, the corporation argued that its expectation of privacy in its commercial curtilage was violated when the Environmental Protection Agency took precision aerial photographs of the 2,000 acre plant complex. Dow had taken elaborate precautions to secure the complex from ground intrusions. The Sixth Circuit Court of Appeals held that whatever the protections afforded commercial curtilage barring ground level intrusions, the aerial photographs did not violate any expectations of privacy. *Id.* at 236, 106 S.Ct. at 1825–26. The Supreme Court explicitly refrained from ruling that commercial curtilage did not enjoy constitutional protections. "Any actual physical entry by EPA into any enclosed area would raise significantly different questions, because the businessman, like the occupant of a residence, has a constitutional right to go about his 'business free from unreasonable official entries upon his private commercial property.'" *Id.* at 237, 106 S.Ct. at 1826 (quoting *See v. City of Seattle*, 387 U.S. 541, 543, 87 S.Ct. 1737, 1739, 18 L.Ed.2d 943 (1967)). In addition, the Court concluded that the open areas of an industrial plant complex spread over 2,000 acres are "not analogous to the curtilage of a dwelling for purposes of *aerial surveillance.*" 476 U.S. at 239, 106 S.Ct. at 1827 (emphasis added). The Court noted at this point that it was not reaching the issues raised by the Court of Appeals for the Seventh Circuit in *United States v. Swart*, 679 F.2d 698 (7th Cir.1982) involving actual physical entry onto business premises. 476 U.S. at 239, n. 7, 106 S.Ct. at 1827, n. 7. In *U.S. v. Swart,*

the Seventh Circuit explicitly ruled that the curtilage of a business is subject to Fourth Amendment protections.

The Supreme Court's admittedly narrow holding in *Dow Chemical* does not suggest, as defendants argue, that commercial curtilage has no constitutional protections. Instead, the Courts' deliberate limitations suggest that the Supreme Court did not want to completely exclude commercial curtilage from the protections of the Fourth Amendment. This Court finds that under existing law, commercial curtilage is subject to the Fourth Amendment. However, as in all Fourth Amendment analysis, the Court must determine whether the reasonable expectations of privacy in the commercial curtilage of each of the businesses were violated by the INS' entry onto the premises. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

■ The centrally relevant consideration in determining the extent of the curtilage is "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *United States v. Dunn*, 480 U.S. 294, 301, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326 (1987). The *Dunn* Court identified four factors useful in analyzing curtilage questions: (1) the proximity of the area claimed to be curtilage to the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (3) the steps taken by residents to protect the area from observation by people passing by. *Id.* at 301, 107 S.Ct. at 1139–40. The Court refused to adopt a bright line rule that curtilage should extend only to the nearest fence. Fences, however, are to be considered in defining the curtilage. *Id.* at 301, n. 4, 107 S.Ct. at 1139 n. 4.

The Court finds that these factors, with some adaptation to the nature of business premises, are equally relevant in determining the extent of commercial curtilage. *See Dow Chemical*, 476 U.S. at 245–246, 106 S.Ct. at 1830–31. (Powell J. dissenting) (Review of Fourth Amendment application to businesses parallels application to private homes, except administrative or regulatory searches may be considered reasonable in business context.) The third factor, "the nature of the uses to which the area is put" is especially relevant where the nature of the business requires production within the curtilage adjacent to buildings. The curtilage in these instances is usually an integral part of the commercial establishment and production process. If steps are taken to protect these areas from public intrusion, the business has a reasonable expectation of privacy in the curtilage to be free from physical entries and searches without a warrant.

■ Skylark Nursery produces ornamental plants and containers for sale to the wholesale trade. The operation includes a greenhouse, a work building, and a maintenance shop. A fence encircles the nursery premises. At the entrance to the nursery are two stone pillars on either side of a driveway with signs stating the hours of operation and "No Retail Sales." Periodic signs along the front and back fences say "Private Property, "No Trespassing." Some of the work occurs inside the structures and greenhouses, while some production work takes place outside where the containerized plants are arranged. Roads run throughout the property. There is a posted sign that says "15 mph".

In the first operation, Mr. Farmer–Bowers, Skylark's working president/general manager, heard his sales manager shouting about a vehicle speeding by the office. Two vehicles entered the premises and INS officers arrested several workers. The INS never asked for permission to enter and search the premises, nor was Farmer–Bowers or any one else ever presented with a warrant. The second raid was similar to the first; Mr. Farmer–Bowers observed a speeding vehicle enter the premises. He followed the vehicle. No warrant was presented and no permission to enter was ever requested. The third raid took place at the parking lot. Once again, the INS officers never sought consent. Indeed, the INS did not even speak with any of the supervisory personnel. By the fourth incident, Mr. Farmer–Bowers was able to stop

the INS vehicles from entering the premises. He met the agents at the top gate, indicated that the property was private and requested a search warrant. The INS agents left and did not return.

The government argues that Skylark Nurseries is open fields and a warrant was not required to enter the property. Although Skylark Nurseries would undoubtedly be subject to aerial photos of its business, the INS entered into areas of the business where the public is normally restricted entry. Parts of the business would be visible from the highway. The INS agents, however, did not limit their search to observations from strategic viewpoints, but entered onto the premises, speeding by at twice the normal speed.

The Court finds that Skylark's reasonable expectations of privacy entailed an expectation to be free from physical entry onto fenced off business premises, where production work takes place, and the public is not granted access. Although the area is large and thus not in close proximity to the actual office, the remaining three factors discussed in *Dunn* are met in this case.

The nature of the search is relevant to the nature of the protections taken to protect a business' privacy.[4] In this instance, Skylark took steps to protect the curtilage from physical intrusion, not visual observation[5]. Indeed, if the INS had conducted a visual or aerial search, *Dow Chemical* would undoubtedly apply and Skylark would not be able to contest the constitutionality of the search. That is not the case. Skylark's reasonable expectation of privacy to be free from physical intrusions was violated when the INS agents entered the property without a warrant and without consent.

■ Neve Roses is also in the wholesale nursery business, and the business has greenhouses as well as parcels of land devoted to containerized planting. The business is not open to the public. The workers are generally in the greenhouses. During one of the raids, Mr. Neve saw border patrol agents enter one of the buildings. He asked one of the agents what they were doing and requested a warrant, he did not receive a response. No workers were seen running or yelling.

The INS/Border Patrol agents violated Neve Roses' reasonable expectations of privacy when they entered the greenhouses, without a warrant and without consent. Under no stretch of the imagination can the greenhouses, enclosed buildings where the business of growing plants is accomplished, be considered open fields under *Oliver*. The Court need not reach the issue of whether the area used for containerized planting consisted of open fields since the Border Patrol agents did not restrict their search to these areas, but physically entered the greenhouse buildings.

■ At Petaluma Mushroom, the buildings are surrounded by a concrete slab. At one part of the slab, hay is kept moist to be used later in the growing rooms. The public is not allowed in the areas surrounding the growing rooms. The property boundaries are demarcated with a fence. When the border patrol agents entered the property, they crossed over the slab, parked their vehicles next to the place with the hay and proceeded to enter into the areas around and between the growing rooms. This entry onto the curtilage immediately surrounding the business violated Petaluma Mushrooms' expectations of privacy.

■ San Jose Brick is a wholesale-only manufacturer of bricks. Access to the fenced-in yard where the bricks are stacked

---

**4.** In *Dow Chemical,* the Court emphasized the fact that Dow Chemical had not taken steps to protect itself from aerial survey, only ground intrusion. 476 U.S. at 237 n. 4, 106 S.Ct. at 1826 n. 4. In footnote 5, the Court reiterated the premise that "Fourth Amendment cases must be decided on the facts of each case, not by extravagant generalizations." Thus the type of invasion actually occurring must form the basis of the reasonable expectation of privacy analysis.

**5.** "Light waves cross thresholds with a constitutional impunity not permitted arms and legs. Wherever the eye may go, the body of the policeman may not necessarily follow" Moylan, *The Plain View Doctrine,* 26 Mercer L.Rev. 1047, 1096 (1975).

and manufactured is open only to building material dealers with flexibly scheduled appointments to pick up brick. Members of the general public do not normally enter the brickyard. When unauthorized persons enter the yard, the manager is immediately notified. Signs are posted stating "Wholesale only," "No parking," "Employees only beyond this point." There are two gates between the street and the brick yard. The mail truck regularly enters past the first gate to deliver the mail.

INS agents drove past the two gates, parked by the office and arrested employees near a forklift. The brick yard was not an open field, but the curtilage of a business and an area where the business was in fact conducted. The two gates served to enclose the brick yard, the second gate providing a barrier across which even employee vehicles were not allowed to cross. San Jose Brick had taken reasonable, if not excessive, steps to restrict the entry of the public onto the premises.

The INS violated San Jose Brick's reasonable expectation of privacy and freedom from physical searches when the agents drove into the brick yard to search for and arrest the employees near the forklift. The INS did not possess a warrant, nor was consent even sought to enter the premises. The Court notes that the agents, having parked near the office could easily have requested the consent of the manager to enter and question the employees.

■ Finally, defendants argue that the search conducted at RJF Enterprises is not subject to the scrutiny of the Court because agents entered the open work area adjacent to the business. This work area is covered, like a carport, although it is not surrounded by walls. The business premises are enclosed by a chain link fence which does not impede visual inspection of the entire work area. This open work area is unlike the open fields discussed in *Oliver.* It is contained, developed, populated and set aside for a particular business purpose. The premises are not open to the general public and RJF does not conduct walk-in trade.

The two armed agents who ran into the work area, when questioned as to the justification for entering without a warrant, answered that they did not need one "if they could see Mexicans in plain view from the street." [6] While persons of Mexican ancestry may arguably be identified from a street, a worker's Mexican ancestry does not establish probable cause to search a private place. The agents violated RJF's expectation of privacy. In the absence of a warrant or consent, the search was unconstitutional.

■ In American Electro, defendants assert that because a roll-up garage door was open, affording a clear view to the public of the inside of the premises, agents did not need a warrant or consent to enter and search the factory. The open garage door does not provide authorization to physically enter the factory. Indeed, established policy at the factory dictated that any client or customer arriving at the premises was required to go directly to the office of the owner before doing any business with the company.

■ Peppered throughout the government's motion to dismiss are suggestions that because the public could possibly see into the businesses, the premises do not enjoy an expectation of privacy from physical intrusion. However, absent an exception to the warrant requirement, viewing alone does not justify a physical entry onto private property.[7] Instead, the proper

6. In 1987, there were 5,879,800 Hispanics in California. Under the border agent's theory, 21.5% of the California population would be subjected to a lowered expectation of privacy simply because of their racial and ethnic status. California Population Characteristics: Regional Market Update and Projections. Colorado, Center of Continuing Study of the California Economy, 1988.

7. *See Wilson v. Health & Hospital Corp. of Marion Cty.,* 620 F.2d 1201 (7th Cir.1980) Rejecting the creation of an "open and unsecured" exception to the warrant requirement, the Seventh Circuit held that a building open to the plain view of an officer in the street can not be subjected to a subsequent search within the building. Even if violations were visible from the street, these form the basis for securing a

course is for the agents to secure a warrant based on evidence garnered from what they may have seen from their public vantage point. Defendants fail to appreciate the fact that the entry is a subsequent search which itself must be justified as an exception to the warrant requirement.

At this point in the case, defendants do not argue that the agents viewed anything within the American Electro factory to justify a warrantless entry and search.

 At Monterey Restaurant, an agent entered the non-public kitchen area through a closed back service door. Defendants contend that because the kitchen is visible from a window and from the public space in front of the counter, the agent did not need a warrant or consent to enter the premises. The Court finds that the INS violated Monterey Restaurant's expectations of privacy in the non-public kitchen area when the agent entered the kitchen without a warrant and without consent.

Under defendants' theory of the plain view doctrine, every business or residence with a window to the world is subject to a physical search. If the residence or business has an Hispanic or visibly ethnic employee or resident, neither a warrant nor consent is required. Such a scenario is repugnant to this country's historically held notions of freedom and privacy. Businesses are not required to board up their windows and cover their doors in order to enjoy an expectation of privacy. *Wilson v. Health & Hospital Corp.*, 620 F.2d at 1212. And an open window, does not make a private place public.

In this case, application of the plain view doctrine is complicated by the fact that the INS is searching for persons who do not have the proper immigration documentation. Unlike contraband, an undocumented alien is not easily identifiable from any distance. The sighting of an Hispanic worker, even an Hispanic worker speaking Spanish can not, without more, form the basis for a warrantless entry.

Defendants do not contest the unconstitutionality of the searches conducted at

Oneto Metals and El Torito Restaurant. At Oneto Metals, agents entered the non-public area of Oneto Metal Products, without presenting a warrant or seeking consent from Chris Lorenz, the Plant Manager. When the plant manager approached the officer and offered to help him, the officer flashed a badge, said "No" and continued his questioning. Even if the offer of assistance could be construed as consent to the search, the officer needed a warrant or consent prior to the commencement of the search. At El Torito, agents entered non-public areas of the restaurant without a warrant and without ever requesting consent from any of the supervisory personnel present that day.

 Through the evidence submitted on the warrantless, non-consensual raids conducted at Oneto Metal Products, Skylark Nurseries, American Electro Finishing, San Jose Brick, Monterey Restaurant, RJF Enterprises and El Torito Restaurant, the Court finds that plaintiffs have shown, by a preponderance of the evidence, that the INS has a pattern and practice of engaging in warrantless searches, without consent and without exigent circumstances in violation of the Fourth Amendment to the United States Constitution.

#### (2) *Does the INS coerce consent?*

 Defendants argue that the INS agents received consent to search many of the businesses presented at trial. In addition, defendants contend that plaintiffs bear the burden of showing that consent was not obtained. "[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority. *Lo–Ji Sales, Inc. v. New York*, 442 U.S. 319, 329 [99 S.Ct. 2319, 2325–26, 60 L.Ed.2d 920] (1979)...." *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1982). The rule was followed in *LaDuke v. Nelson*, 762 F.2d 1318, 1329 (9th Cir.1985). Defendants ignore the Su-

warrant and not an exception to the warrant requirement. 620 F.2d at 1212.

preme Court and Ninth Circuit cases allocating the burden to the government to prove voluntary consent, baldly stating that *LaDuke* is "dictum and contrary to other Ninth Circuit Court of Appeals and Supreme Court precedent." Defendants fail to cite contrary authority. This Court will follow *Florida v. Royer* and *LaDuke v. Nelson* and leave the burden of showing an exception to the warrant requirement on the government.

■ Because the government has yet to present its case, the Court will limit its inquiry into whether the circumstances surrounding the search indicate a lack of voluntary consent. If the evidence at the close of plaintiffs' case shows coerced consent, defendants will bear the burden of showing voluntary consent in their case-in-chief.

Because the burden is on the government to prove voluntary consent, their motion to dismiss the raids at Mammoth View Lodge, Pedro's Restaurant, and Garcia's Restaurant on the unsubstantiated speculation that consent *may* have been given is denied.

At other businesses, plaintiffs assert that consent was involuntary because it was coerced by threats or demands, the search exceeded the scope of the consent granted, and consent was obtained by misrepresentation.

*LaDuke v. Nelson*, 762 F.2d at 1329, summarized many of the factors considered probative on the factual question of the voluntariness of consent, including: "failure to inform of right to refuse consent," *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); "business sophistication," *United States v. O'Looney*, 544 F.2d 385, 388 (9th Cir.), *cert. denied*, 429 U.S. 1023, 97 S.Ct. 642, 50 L.Ed.2d 625 (1976), "show of force by armed officers; display of authority," and "defendant awakened by numerous officers at early morning hour," *United States v. Marshall*, 488 F.2d 1169, 1187–89 (9th Cir. 1973). In order to show voluntary consent, the facts, in totality, must demonstrate more than mere " 'acquiescence to a claim of lawful authority.' " *LaDuke v. Nelson*,

762 F.2d at 1329 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 549, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968)).

Although the failure to inform an employer of her right to refuse consent does not, of itself, violate the Fourth Amendment, the INS's own procedures direct agents to explain the alternatives to consenting to a search, "including the fact that the employer may deny officers permission to enter the facility." United States Department of Justice, Immigration and Naturalization Service, *Investigator's Handbook*, 4–9.12.

At Shamrock Technologies, an agent told the office manager, Marianne Crumb, that "he knew that we had illegals back there and that he was going to get them." Ms. Crumb described the agents demeanor as authoritative, very demanding and persistent. He also told Ms. Crumb that if he had to come back, "he was going to shut the doors down." Ms. Crumb was never asked for consent to search the premises, nor was Ms. Crumb informed of her right to refuse consent. Nevertheless, Ms. Crumb felt that she did not have the authority to allow entry to the INS, and after unsuccessfully trying to contact the owners called the production manager, Rogelio Rodriquez, to ask him what rights employers had to refuse entry.

Ms. Crumb testified that she described her conversation to Mr. Rodriquez, who then asked to speak to the agent. Mr. Rodriquez testified that the agent demanded entry to search the production area. After Mr. Rodriquez informed the agent he didn't have any authority to grant entry, the agent started speaking louder and told Mr. Rodriquez, "For your information, I can come back and close the shop." Mr. Rodriquez told the agent, to go ahead and search, since there was no other choice. Mr. Rodriquez did not want to be responsible for shutting down the plant.

At Rojon Electronics, the agent informed the manager he would return in half an hour with a warrant if consent were not granted, adding "Let me in or else." At Bell Industries, the agent informed Mr. Clifford Zachman that he intended to go

through the factory. The Court notes that this is not a request, but an announcement.

These three incidents support plaintiffs' claim that consent was not voluntarily given. In addition to the failure to inform the businesses of their right to refuse consent, which standing alone is insufficient to prove invalid consent, the agents accompanied their requests for entry with either direct or veiled threats and a show of authority which led the consenters to believe they had no choice but to capitulate to the agent's demands. These incidents provide sufficient indications of coerced consent to require defendants to meet their burden of showing willful consent.

■■■ Plaintiffs also accuse the border patrol agents of obtaining consent through "trickery," concealing the teams of agents from the view of the person who consented to a search by a single officer. The Ninth Circuit has held that a consent to search may not be validly qualified by the number of officers allowed to conduct the search. *United States v. Rubio*, 727 F.2d 786, 797 (9th Cir.1983). Plaintiffs do not contend that the INS exceeded the scope of consent by entering with more than one agent. Instead, they argue that consent would not have been granted if the proprietors and managers had known there were whole teams waiting to raid the premises.

The Court recognizes that the type of search conducted with teams of agents is strikingly different than a single agent walking through a plant asking questions. This factor is an element contributing to the totality of circumstances reviewed to determine whether consent was freely and voluntarily given. *United States v. Sierra–Hernandez*, 581 F.2d 760, 764 (9th Cir. 1978) However, the Court also notes that *Rubio* reasoned that the entry of additional officers would not diminish the consenters expectation of privacy. 727 F.2d at 797. Unless the agent requesting consent misinformed the consenter as to the scope of the

search[8], the consenters' relinquishment of privacy may not have been altered regardless of the number of agents conducting the search. Nevertheless, this is a factual question which the Court will resolve after defendants have a chance to rebut the testimony.

The Court finds that plaintiffs have come forward with sufficient evidence on all of the claims asserting the unlawful entry of the INS agents onto business premises to proceed in the case.

### D. *Defendant's Detention Of Entire Workforces*

■■■ In their sixth claim, plaintiffs allege that defendants have a policy, custom and practice of "surrounding business premises, and securing and blocking exits so that employees are prevented from leaving, without cause to believe that all those detained within are aliens unlawfully present in the United States ..."

Defendants argue that this claim is precluded by the holding in *INS v. Delgado*, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). The Supreme Court rejected

> the claim that the entire work forces of the two factories were seized for the duration of the surveys when the INS placed agents near the exits of the factory sites.

*Id.* at 218, 104 S.Ct. at 1763.

> The presence of agents by the exits posed no reasonable threat of detention to these workers while they walked throughout the factories on job assignments. Likewise, the mere possibility that they would be questioned if they sought to leave the buildings should not have resulted in any reasonable apprehension by any of them that they would be seized or detained in any meaningful way. Since most workers could have had no reasonable fear that they would be detained upon leaving, we concluded that

---

8. For example, Mr. Tuttle of Benicia Foundry may have been misinformed as to the scope of the consent. There the agent had asked to talk to few of Mr. Tuttle's employees. Mr. Tuttle agreed to the interview. Mr. Tuttle testified that with his consent, he was allowing the agent to enter the shop to interview a couple of people. As Mr. Tuttle accompanied the agent to the shop, the agent radioed to someone and Mr. Tuttle observed 5 to 6 agents run into the production area from another door.

the work forces as a whole were not seized.

*Id.* at 219, 104 S.Ct. at 1764 (footnote omitted).

In *INS v. Delgado*, the Court found that the one attempt to restrain a worker from leaving the factory was an "ambiguous and isolated event." *Id.* at 218, n. 6, 104 S.Ct. at 1764, n. 6. During the Delgado survey, the individual encounters retained a consensual character and none rose to the level to constitute detentive interrogation. The Court went on to state that "Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment." *Id.* at 216, 104 S.Ct. at 1763.

However, whereas the *Delgado* survey involved solely non-detentive questioning, the evidence in this case shows coercive, physical detentions and restraints. Unlike the employees at the garment factory, workers here were told they couldn't leave. The agents at the doors of the factories and businesses raided here did not confine themselves to non-detentive questioning of workers exiting the plant, but at times, physically restrained people from leaving the secured areas.

*Delgado* does not stand for the proposition that all work place surveys, regardless of their character, prophylactically fall within the confines of the Fourth Amendment, free from judicial scrutiny. Instead, *Delgado* states that the posting of agents at the exits and entrances, without more, does not constitute a detention of the entire workforce. Consensual questioning does not violate the Fourth Amendment, however, INS behavior which exceeds the boundaries of *Delgado* may be found violative of constitutional protections.

The raid on Dalena's College of Beauty stands in stark contrast to the facts recited in *Delgado*. The receptionist was told that no one was to leave and that agents would be stationed at the doors to prevent any departures. When an instructor attempted to leave the building during the raid, she was prevented from doing so by an uniformed INS agent stationed at the front door. When she explained that she wanted to buy a pack of cigarettes, he shook his head and refused her exit. A student attempted to leave through the back door, but was prevented from doing so by an agent stationed at the rear exit. When her instructor, who couldn't understand who would keep anybody from leaving the building, went to check, she was unable to open the back door. Although she opened it slightly, an agent pushed it closed. She slowly reopened the door and asked the agent why her student couldn't leave. She was told that no one was allowed to leave. She was unable to open the door again.

Unlike *Delgado*, the students and instructors were not allowed to move around the building as they would customarily have done during a regular class day. For two hours, the INS agents dictated the physical movement of instructors and students alike, ordering the detainees from one room to another. During those two hours, the individuals at Dalena's college were not restrained by "voluntary obligations to their employers," 466 U.S. at 210, 104 S.Ct. at 1758, but by the sheer force of authority exerted by the INS agents when they commandeered Dalena's College.

Similarly, the raid on Pt. St. George Fisheries goes beyond the *Delgado* consensual encounters. The agents instructed all of the workers in the room not to move or attempt to leave. One worker was grabbed when he tried to leave the room. He was told he could not leave the room unless he could produce immigration papers. This worker was not given the option, present in the consensual encounters described in *Delgado*, of refusing to answer and continuing on his way. 466 U.S. at 218, 104 S.Ct. at 1763–64.

At Modern Mode, workers who refused to answer agents' questions were pushed into vans and arrested. At Pacific Mushroom, when agents entered one shed, they shouted, "Don't move; you're under arrest. We are from immigration!" By their actions, the agents effectively detained the

entire shed. Indeed, they indicated they had arrested all the employees in the shed.

Although the Court has herein reviewed but a few of the incidences, the record contains sufficient evidence to prove plaintiffs' claim that the INS detains entire workforces without probable cause or reasonable suspicions that the entire workforce is undocumented. This case is distinguished from *Delgado* where workers were not forcibly detained or prevented from leaving the secured area.

Plaintiffs' claim encompasses not only attempts to surround the worksites, but also the border patrol agents' attempts to detain and arrest, without reasonable suspicion or probable cause, nearly all workers at the sites. Plaintiffs correctly note that defendants' failure to successfully cast their net around every worker in the plant does not change the nature of defendants' actions.

### E. Detentions, Arrests and Abuse Of Individual Workers

Plaintiffs claim that defendants have a pattern, practice and policy of detaining workers solely on the basis of their Hispanic appearance and without reasonable suspicion of illegal alienage. Plaintiffs assert that defendants have a pattern, practice and policy of arresting Hispanic workers without probable cause, and of engaging in unconstitutional abuse of these arrested workers. Defendants move to dismiss these claims, arguing that the encounters with the immigration agents are at most consensual, and probable cause exists to arrest the workers. In addition, defendants assert that plaintiffs have failed to prove that the INS agents abuse detained and arrested workers.

#### (1) Unlawful Detentions

Questioning employees on their immigration status, by itself, is not a violation of the Fourth Amendment. However, if "the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded," a Fourth Amendment detention has occurred. *INS v. Delgado*, 466 U.S. at 216, 104 S.Ct.

at 1762–63. Defendants' extrapolate from *Delgado's* description of incidences of consensual encounters a theory that all contacts between individuals and INS agents begin with consensual encounters. Once again, defendants seem to ride on *Delgado* as a magic carpet legitimating all INS enforcement activity at worksites. This is directly contrary to *Delgado* and subsequent Ninth Circuit opinions on the Fourth Amendment. The question of whether an encounter with an INS agent is consensual or a detention requires an intensely fact based analysis.

In evaluating the test for seizure laid down in *Delgado*, 466 U.S. at 216, 104 S.Ct. at 1762–63, the finder of fact looks to the surrounding circumstances, including,

> the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of a citizen, or the use of language or a tone of voice indicating that compliance with the officer's request might be compelled.

*Martinez*, 831 F.2d at 826 (quoting *U.S. v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)).

In addition, the law on investigatory detentions is well settled since *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). An investigating officer may detain and question an individual based on "specific and articulable facts." *United States v. Brignoni–Ponce*, 422 U.S. 873, 880, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (quoting *Terry v. Ohio*, 392 U.S. at 21, 88 S.Ct. at 1880). A detaining officer's reasonable suspicions must "flow from objective facts and be capable of rational explanation. While an officer may evaluate the facts supporting reasonable suspicion in light of his experience, experience may not be used to give the officers unbridled discretion in making a stop." *Nicacio v. INS*, 797 F.2d 700, 705 (9th Cir.1985). Hispanic appearance or ancestry alone does not provide a legitimate basis for a detention. *United States v. Brignoni–Ponce*, 422 U.S. at 886–87, 95 S.Ct. at 2582–83. Constitutional restraints on unbridled police detentions apply to detentions for questioning on

illegal alienage. *United States v. Brignoni–Ponce,* supra; *Nicacio v. INS,* 797 F.2d 700, 702 (9th Cir.1985). Finally, a "stop may last only so long as is necessary to carry out its purpose and the investigative methods used should be the least intrusive means reasonably available to confirm or dispel the officer's suspicion." *Martinez v. Nygaard,* 831 F.2d at 827.

▇▇ At this point in the case, the Court has not heard defendants' articulation of the reasonable suspicions the agents possessed when they detained workers. However, the Court may review plaintiffs' evidence to determine whether class members were detained within the meaning of the Fourth Amendment.

As discussed above, all of the instructors and students at Dalena's College were detained within the meaning of the Fourth Amendment. In light of the INS's conduct at the school, a reasonable person would not have believed she was free to leave the premises or refuse to answer the agents' questions.

At Modern Mode, Marcos Arceo Gutierrez testified that as he was walking to the bathroom he was approached by an agent who told him not to run and to kneel. He kept walking. The agent repeated his command. Although Mr. Gutierrez protested that he only knelt in prayer, the agent enforced his order and eventually handcuffed Mr. Gutierrez.

At Bay Packaging and Converting, Jose Obedo Torres was detained and handcuffed at his machine. Mr. Torres testified that when an agent demanded to see his "green card," he asked the agent, dressed in civilian clothes, to identify himself. The agent then ordered Mr. Torres to turn off his machine. Mr. Torres, citing his employer's contrary instructions, refused to shut the machine off. He was immediately thereafter handcuffed. This encounter, which even if it could be described as consensual at its initiation, became detentive once the officer began issuing orders to the worker. There can be no doubt that once Mr. Torres was handcuffed, he was, at the very least, detained.

At San Jose Brick, Marciano Gutierrez was concentrating on his work, operating a forklift, when an INS agent grabbed his hand, told him to stop the forklift, and ordered him down from the machine. Immediately thereafter, Mr. Gutierrez was handcuffed and taken to a van. No questions were asked of Mr. Gutierrez before he was handcuffed. At the very least, Mr. Gutierrez was detained within the meaning of the Fourth Amendment.

At United Foam, Ignacio Alejandre was sitting on the ground on his morning break with a co-worker when an agent, dressed in civilian clothes, approached and asked his co-worker for papers. The co-worker stated he didn't have papers and was handcuffed. The agent then turned to Ignacio Alejandre and asked "And you what?" or "What about you?" Although Mr. Alejandre knew the agent was asking for papers, he expected the agent to directly pose the question. "It wasn't proper of him to ask me, 'and what about you,' because he didn't know whether I had any papers on me or not." Acting according to his belief of what was proper, Alejandre responded "And me what?" He was immediately handcuffed. Mr. Alejandre's response is just as easily understood as a decision not to answer the agent's question, as an effort to put the agent to the task of asking clear, direct questions on his immigration status. Mr. Alejandre's response is neither unlawful nor probable cause for an arrest. The Court will await defendants' explanation for why Alejandre's question justified his detention, but there is no doubt that he was, at that moment, at the very least, detained.

It is evident from the testimony that the INS has a pattern and practice of entering businesses, often at a run, and grabbing and handcuffing first, asking questions later. For example, this pattern was evidenced at El Torito Restaurant, Pedro's Restaurant, RJF Enterprises, Petaluma Poultry, Modern Mode, and Pacific Mushroom. At Petaluma Poultry, two Hispanic women were handcuffed and taken outside even though they had their green cards on their person.

At Pacific Mushroom, Evangelina was standing outside a door, when she was grabbed by the hand. Her request for an attorney resulted in her being taken to a van and transported away. At various businesses, when workers responded to questions with silence or requests to speak to their attorney's, they were uniformly detained and arrested.

Besides forcibly grabbing workers and moving them from place to place, apparently without reasonable suspicions of illegal alienage or probable cause to arrest [9], INS agents also used classic displays of authority and force to lead workers to believe they were not free to leave or free to refuse to answer the agents' questions. At Schmitz Meats, agents drew or displayed their guns when ordering workers to stop and not move. When U.S. citizens protested their treatment and refused to answer the agents' questions, they were intimidated and harassed until they relented and produced documentation. One worker was grabbed and pulled away by an agent with his gun drawn. The worker, Mr. Ruiz, protested that he was an American citizen. When Mr. Ruiz showed his driver's license, he was released.

### (2) *Warrantless Arrests*

█ Plaintiffs contend that many of these detentions evolved into arrests when the workers were handcuffed, placed in INS vehicles, or otherwise put in custody. Plaintiffs correctly note that an arrest requires more than a reasonable suspicion of undocumented status, but also probable cause to believe that the suspect is in violation of the immigration laws. *Gonzales v. City of Peoria*, 722 F.2d 468, 477 (9th Cir.1983).

Title 8 U.S.C. section 1357(a)(2) authorizes INS agents to make arrests without a warrant if the agent "has reason to believe that the alien so arrested is ...in violation of [the immigration laws] *and* is likely to

escape before a warrant can be obtained for his arrest ..." (emphasis added).

Defendants draw from other circuits to argue that, at the most, warrantless arrests are justified, "when the alien's deportability is clear and undisputed." *Contreras v. United States*, 672 F.2d 307, 309 (2d Cir.1982).

The statutory requirement that there be likelihood of escape before a warrantless arrest is made is "seriously applied" in the Ninth Circuit. *United States v. Cantu*, 519 F.2d 494, 497 (9th Cir.), *cert. denied*, 423 U.S. 1035, 96 S.Ct. 569, 46 L.Ed.2d 409 (1975). In *Cantu*, the likelihood of escape was a serious threat because the arrested immigrants were at all times, highly mobile, and traveling in a car along an interstate.

In contrast, the individuals arrested in this case failed to meet many of the INS' own criteria for determining a likelihood of escape: the existence of altered papers, evidence of previous arrests, lack of ties to the community such as family, home, or a job, and attempts to flee may justify the belief that a detained immigrant is likely to flee. Immigration and Naturalization Service, *M–69*, p. 16. These factors do not describe many of the arrested workers in this case. Here, workers were long-term employees, had roots in the community, and family with proper immigration status. Several arrested employees were involved in pending immigration proceedings and had attorney representation.

█ In addition, defendants fail to justify why so many workers were arrested even though they were in constructive possession of immigration papers [10]. The Court cannot countenance an arrest of a lawful permanent resident for, as defendants argue, the convenience of the INS officers busy with other matters at the time. Constitutional protections may not be abridged for the mere convenience of

---

9. As stated earlier, defendants have not had an opportunity to present evidence of the articulable reasons or probable cause justifying the detentions or arrests. At this point, the Court has only found that forceful detentions did indeed occur at the different worksites.

10. The Court finds that constructive possession means possession of the documents at the workplace. Constructive possession may not be stretched to include a worker's home, when that employee is at work.

immigration officials. Exigencies of the moment may justify a longer stop than is normally permitted. However, the agents' own practice of detaining workers *en masse* cause both the unlawful detention and the havoc which delays the release of lawful permanent residents.

For example, Enrique Iñiquez was detained and handcuffed, even though he had his green card in his pocket. With his free hand, he took his green card out and showed it to the agent. Nevertheless, he was taken to a van and handcuffed to a co-worker for another eight minutes before being released. Defendants argue that the agents were too busy to release Mr. Iñiquez. However, if the agents had followed constitutional procedure and posed questions to Mr. Iñiquez prior to handcuffing him, he would not have been unlawfully detained and arrested. In the same vein, the large numbers of unlawful detentions make prompt remedial action more difficult.

Even under defendants' proposed standard—that warrantless arrests are authorized whenever deportability is clear and undisputed—many of the workers were arrested prior to questioning on immigration status. Deportability is not clear when an INS agent knows nothing more about an individual than she is working at a raided business and is Hispanic.

In summary, plaintiffs have shown that the INS has a pattern and practice of detaining workers without reasonable suspicion of immigration law violations. In addition, many of these detentions quickly evolve into arrests, without probable cause, without a warrant and without a showing that the arrested individual is likely to flee before a warrant may be obtained.

(3) *Unconstitutional Abuse Of Workers*

■ Plaintiffs claim that the INS agents carry out workplace raids in a climate of fear, intimidation and coercion created by the persistent pattern of verbal and physical abuse directed to Hispanic workers. *Graham v. Connor*, — U.S. —, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) reviewed the "facts and circumstances" that must be weighed in deciding whether a particular use of force is excessive, including:

the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Id.* — U.S. at —, 109 S.Ct. at 1872.

As plaintiffs correctly note, the "crime" for which these workers are arrested is a civil offense. Nevertheless, the evidence shows that the INS agents verbally and physically abuse the detained and arrested workers. There is evidence the agents grab, push, kick and handcuff workers even in the absence of any indication of attempted flight or resistance. The most egregious example of abuse deserves extensive mention here.

Ramon Estrada was drinking coffee in his car when an INS agent approached him and asked him for papers. Mr. Estrada got out of the car and handed the agent a letter from his attorney. The agent then grabbed Mr. Estrada from the belt and took him to the bus. The bus was driven to El Faro Beach where agents began asking Mr. Estrada questions. Mr. Estrada declined to answer the questions and asked to speak to his attorney. The agent drew his finger across his throat and ordered Mr. Estrada to the front of the bus. Two uniformed agents pulled Mr. Estrada off the bus, mishandling him, "just like a dog would handle a rabbit." He was handcuffed and slammed down against a patrol car. The two agents held him from either side, grabbing his collar and banging his head and face against the patrol vehicle. He was verbally abused and insulted, called a "rascal," "bastard," "stupid," and "pendejo." Mr. Estrada was transported to the detention center in the patrol car.

When Mr. Estrada requested a hearing before a judge and a call to his attorney, he was told that he had no rights in this country. Mr. Estrada was forced to sit in a corner of a room where there was dog excrement. His face was shoved towards the excrement and he was told, "That's what you are."

The excessive and abusive treatment of Mr. Estrada is not an isolated event. Indeed, the record is replete with instances of verbal and physical abuse. In light of the civil offense and the lack of evidence of resistance, the Court finds that the INS agents exercise constitutionally unreasonable force when detaining and arresting immigrant workers.

### F. *Discriminatory Intent*

 The racial slurs and verbal abuse launched at the Hispanic workers, along with the systematic practice and pattern of relying on racial criteria when making detentions and arrests, supports plaintiffs' claim that the INS acts with animus and racial prejudice against Hispanics. Plaintiffs argue that the evidence of reliance on "explicit racial characteristics" and use of "stereotypic references to individuals," *Flores v. Pierce*, 617 F.2d 1386, 1390 (9th Cir.1980), combined with evidence of invidious discrimination demonstrates both intent to discriminate and disparate impact on class members. The Court agrees. Defendants' demonstration of a few incidences where non-Hispanics were also questioned does not defray the overwhelming evidence of INS border agents singling out Hispanic workers for detentions. In addition, when non-Hispanic workers were questioned or detained, they were not subjected to the verbal and physical abuse heaped on the Hispanic workers. Witnesses testified that the questioning of non-Hispanics was courteous. In addition, INS agents allowed supervisors to "vouch" for their non-Hispanic workers, while supervisor protestations of the treatment of legal Hispanic workers were summarily ignored.

The Court finds that plaintiffs have proven that the INS has a pattern, practice and policy of discriminating against Hispanic persons.

### G. *A Pattern And Policy Of Fourth Amendment Violations*

 The unconstitutional practices are so pervasive and widespread that the Court is persuaded they constitute an official policy. Plaintiffs submitted deposition evidence wherein the supervisors acknowledged they were aware of complaints about the INS activities, but found "Operation Jobs" to be normal. INS officials, aware of the agents' actions, have failed to take steps to prevent recurrences and continued constitutional deprivations. Instead, the INS has been restrained solely because of judicial intervention. Defendants then argue that plaintiffs have failed to show a pattern and practice of unconstitutional conduct because, over the thirteen years covered by this lawsuit, plaintiffs can show violations at only a few raids. However, defendants are restrained from conducting ongoing unconstitutional raids by the preliminary injunction issued in 1985. In addition, plaintiffs have shown a pattern of unconstitutional practices at more than a "few" workplaces. The Court finds that at the close of plaintiffs' case, plaintiffs have established a right to relief on all of their claims, including the claims that the unconstitutional conduct is part of a pattern, practice and policy.

## II. CONCLUSION

The Court finds that the class representatives have standing to pursue this action as "persons of Hispanic or other Latin American ancestry."

Rogelio Lona is HEREBY DISMISSED from the case.

The Court finds that the named employer plaintiffs have standing to pursue their claims as asserted in the Seventh Amended Complaint.

The Court finds that the individually named plaintiffs and the plaintiff class have presented evidence in their case-in-chief to prove each of their claims by a preponderance of the evidence. Through the evidence of INS conduct at businesses other than those of the named employers, plaintiffs have shown the existence of a pattern and practice of unconstitutional entries into workplaces. At this point in the case, the evidence shows a policy of unconstitutional searches, detentions and arrests.

452

Good cause appearing therefor, the Court HEREBY DENIES defendants' Rule 41(b) motion to dismiss.

IT IS SO ORDERED.[11]

11. This Order was originally filed June 12, 1989, the Court has refiled the Order for publication on this date without changing any of the sub- stantive rulings contained in the June 12, 1989 Order.